UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DR. THOMAS HOUSE, ET AL.                    Plaintiffs/Counterclaim Defendants

v.                                          Civil Action No. 3:16-cv-00594-RGJ

PLAYERS' DUGOUT, INC., ET AL.               Defendants/Counterclaim Plaintiffs

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiffs and Counterclaim Defendants Dr. Thomas House ("Dr. House") and the National

Pitching Association, Inc. (the "NPA") (collectively, "Plaintiffs") bring this action against

Defendants and Counterclaim Plaintiffs Joseph A. Newton ("Joe Newton"), Joseph John Newton

("Joseph Newton") (collectively, the "Newtons"), and Players' Dugout, Inc. ("PDI") (collectively,

"Defendants") seeking relief for alleged violations of federal and state law. [DE 39]. Defendants

filed a Counterclaim. [DE 40]. The parties now move for partial summary judgment. [DE 43;

DE 67]. Briefing is complete, and the motions are ripe. [DE 51; DE 57; DE 71; DE 72]. For the

reasons below, the Court **DENIES** both motions for partial summary judgment. [DE 43; DE 67]

## I.       BACKGROUND

Plaintiffs develop programs and techniques to enhance athlete performance. [DE 39 at ¶

12]. Plaintiffs have used these techniques while working with various athletes, including Hall of

Fame pitcher Nolan Ryan and NFL quarterbacks Tom Brady, Drew Brees, and Andy Dalton. *Id.*

Plaintiffs own the federally registered NPA Trademark, U.S. Reg. No. 3,202,667, for use in

"clothing, namely, baseball jerseys, pants, and hats." [DE 39-2]. The NPA used the mark in

commerce as early as 2004 and registered it on January 23, 2007. *Id.*[1]

---

[1] As filed, the registration also covered "pre-recorded DVDs and videotapes featuring baseball pitching instruction," but the NPA abandoned that protection upon renewal. [*See* DE 51-12 at 603–04].

In February 2014, Dr. House and Joe Newton, representing PDI, entered into a license agreement (the "Agreement") in which Dr. House (the "Licensor") granted PDI (the "Licensee") an exclusive, worldwide license to train baseball and softball pitchers using the patented "Personally Adaptive Joint Threshold Training" (the "PAJTT program") method. [DE 39-1 at 255]. The Agreement permitted PDI to use Dr. House's "know-how," as defined in the Agreement, for the "purpose of commercializing" the PAJTT program as the "Velocity Plus Arm Care Program ('Velocity Plus')." [DE 39 at ¶14]. The Agreement does not explicitly provide for Defendants to use the NPA Trademark or Dr. House's name as part of the commercialization of the PAJTT Program. But since execution of the Agreement, PDI, with Dr. House's permission, has used the NPA Trademark and Dr. House's name on its website and other various promotional materials. [DE 39 at ¶ 21].

In January 2013, a year before execution of the Agreement, Dr. House sent a letter about the PAJTT program to Joe Newton and an NPA employee named James Evans. [DE 51-5]. In the letter, Dr. House claimed that he had "applied for a patent, copyright, and trademark" to protect his intellectual property. *Id.* Dr. House asked that a written agreement be drafted by February 1, 2013. *Id.* When the parties executed the Agreement over a year later, the Agreement stated that "the Program is patented under a patent issued to the Licensor under the name, PERSONALLY ADAPTIVE JOINT THRESHOLD TRAINING." [DE 39-1 at 255] (capitalization in original).

Despite the Agreement's language, Dr. House never received a patent for the PAJTT program. The parties disagree about whether Defendants knew this when they executed the Agreement, as discussed below in Section III(A)(1). [*See* DE 43-1 at 368-69; DE 51 at 482-83].

Along with the exclusive right to use the patented training methods with baseball and softball players, the Agreement stipulated that Plaintiffs would prevent third parties from using the

training program by enforcing its intellectual property rights against potential infringers. [DE 39-1 at 260]. The Agreement required the Licensor to "defend and protect all infringements upon its patent of the PAJTT Program licensed hereunder at its sole cost." *Id.* The Licensor warranted "to take *all action necessary* to restrain any third party *which the Licensee deems to be selling a product in competition with the Program* licensed to the Licensee which product appears to be an infringement of this Licensor's patent rights." *Id.* (emphasis added).

After the execution of the Agreement, PDI notified Dr. House and the NPA of multiple unauthorized providers using the PAJTT program. For instance, on November 4, 2014, Joseph Newton emailed Plaintiffs informing them that an individual in Florida was pirating the PAJTT program. [DE 51-6]. Three days later, Joseph Newton emailed Plaintiffs to share that one of NPA's regional directors was pirating the PAJTT program. [DE 51-7]. Joseph Newton again emailed Plaintiffs on June 2, 2015, this time with a list of academies promoting the PAJTT program on their websites. [DE 51-8]. According to Defendants, "[t]he purpose of these notifications was to assist House and the NPA in meeting their contractual duty to [take] 'all action necessary to restrain any third party which the Licensee deems to be selling a product in competition with the Program licensed to the Licensee.'" [DE 51 at 485 (quoting [DE 39-1 at 260])]. Other than sending a few letters, Plaintiffs never sought to stop this alleged pirating, and Dr. House never investigated the alleged instances of pirating outlined in the June 2, 2015 email. [DE 51-9 at 587–92].

Under the Agreement, PDI was required to pay royalties and commissions to Dr. House on the 10th day of each month. [DE 39-1 at 256–57]. The Agreement required PDI to maintain and submit reports showing the royalties and commissions payable during the preceding month with supporting information. *Id.* The Agreement also required PDI to maintain records in enough detail

to determine royalties and commissions payable under the Agreement, as well as to permit Dr. House or a designee to examine the records during the term of the Agreement and two years thereafter. *Id.*

Following execution of the Agreement, PDI complied with the Agreement and promptly paid all royalties and commissions. [DE 43-1 at 348]. But PDI stopped paying royalties and commissions in August 2015. *Id.* At that time, neither party sought to terminate the Agreement. [DE 39 at ¶ 24]. PDI also stopped complying with the Agreement's reporting requirements, and it has not paid royalties or commissions since August 8, 2015. *Id.* at ¶ 22. PDI continued to use the NPA Trademark and Dr. House's name on its website and other promotional materials. [DE 43-4 at 414–15].

Defendants claim that because Plaintiffs never patented the PAJTT Program, as outlined in the Agreement, PDI suspended payment of royalties to Dr. House and the NPA, began paying the royalties into an escrow account, and issued a formal demand for assurances that Plaintiffs perform the contract. [DE 5-2 at 75-80]. "Because those assurances were never forthcoming, [PDI] eventually ceased even escrowing the royalty payments which would have been owing had there not been a complete failure of consideration." [DE 51 at 487].

On October 13, 2015, Plaintiffs sent a letter to PDI purporting to cancel the License Agreement because Dr. House and the NPA "ha[d] become aware of a disturbing number of young athletes who claim to have been injured . . . [T]hese letters have [come] . . . directly from the aggrieved parties." [DE 51-11]. Plaintiffs emailed NPA certified coaches telling them that PDI's services were inconsistent with the PAJTT program's methods and that PDI's program is not "safe and effective, and . . . we have learned that several of his customers have been hurt." [DE 51-10].

Defendants claim that they have never received information of a participant being injured because of their program [DE 51-4 at 577], and thus the statements in the October 2015 email were false.

Plaintiffs claim that the statements in the October 13, 2015 email were true because they were based on Dr. House's personal knowledge and two emails received by Plaintiffs in August 2015. [DE 71 at 757-758]. Robert Hurley ("Hurley") of Salisbury, Maryland sent the first email to Plaintiffs on August 25, 2015. In his email, Hurley claims that several youth baseball players in Salisbury were seriously injured after participating in a Salisbury native's "Velo" program. [DE 71-9 at 839-840] ("[M]any baseball players in our small rural area have paid to participate in this Salisbury native's 'Velo' program including my son . . . My son did not last long . . . because he had tremendous pain in his arm . . . However, many other youths remained and from our small area there have been upwards of 10 arm surgeries . . . I feel as if the Salisbury area is an epidemic"). Mark Sheehan ("Sheehan"), an NPA affiliate, sent the second email to Plaintiffs on August 26, 2015. In his email, Sheehan writes that, after visiting the "Newton's facility in Elizabethtown," he was "taken aback" by Defendants' deviations from proper protocols and "naivete when it comes to proper instruction or understanding of mechanics." [DE 71-4 at 805].

On February 6, 2016, Plaintiffs sent written notice of PDI's alleged breach of the Agreement, as required by the procedures outlined in the Agreement. [DE 39-1 at 259; DE 43-5 at 429]. The letter notified Defendants of Plaintiffs' intent to terminate the Agreement if the default was not cured within sixty days. [DE 43-5 at 429]. The letter also reiterated that Defendants could prevent termination of the Agreement within ninety days of the notice with a payment of $500,000 to Plaintiffs under the Agreement's liquidated damages clause. *Id.* Defendants acknowledged receipt of the letter and responded by phone call. [DE 43-4 at 420–21]. Defendants nonetheless admit that such royalties have not been paid. *Id.*

On June 29, 2016, Plaintiffs notified PDI that given its alleged breach of the Agreement, PDI had thirty days to pay Dr. House the $500,000 in liquidated damages and cure its nonpayment of royalties to Dr. House if it wished to override and prevent termination of the Agreement. [DE 39-3 at 267].

On September 14, 2016, Plaintiffs sued Defendants in this Court. [DE 1]. Defendants filed a Counterclaim on January 3, 2018. [DE 40]. The parties now move for partial summary judgment. [DE 43; DE 67].

## II.    STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion." *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252. Additionally, where "the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

## III. DISCUSSION

### A. Plaintiffs' Motion for Partial Summary Judgment

In their Amended Verified Complaint, Plaintiffs outline thirteen separate Counts against Defendants: breach of license agreement and failure to pay royalties against PDI (Count I); breach of agreement and injunctive relief against PDI (Count II); federal trademark infringement against PDI (Count III); federal trademark infringement against the Newtons (Count IV); unfair competition against PDI under the Lanham Act (Count V); unfair competition against the Newtons under the Lanham Act (Count VI); common law trademark infringement against PDI (Count VII); common law trademark infringement against the Newtons (Count VIII); common law unfair competition against PDI (Count IX); common law unfair competition against the Newtons (Count X); unjust enrichment against PDI (Count XI); and unjust enrichment against the Newtons (Count XII). [DE 39 at ¶¶ 36–83]. Plaintiffs also seek punitive damages (Count XIII). [*Id.* at ¶¶ 84–87].

Plaintiffs now move for partial summary judgment on Counts I, III, IV, V, VI, VII, VIII, IX, and X. [DE 43-1 at 352].

### 1. Breach of License Agreement and Failure to Pay Royalties (Count I)

Plaintiffs argue that Defendants breached the License Agreement by failing to pay royalties and commissions after August 2015. [DE 43-1 at 353]. Defendants argue the Agreement is invalid because Plaintiffs misrepresented that Dr. House's program had received patent protection. [DE 51 at 488]. They contend the Agreement is unambiguous in stating that Dr. House's program had received protection, and that protection was the bargained-for consideration the Agreement guaranteed. *Id.* Defendants reason that, without the patent, there was no consideration, no contract, and thus no breach.

To prevail on a breach of contract claim, a plaintiff must 1) establish the existence of a contract, 2) prove a breach of that contract, and 3) show damages flowing from the breach. *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009) (citing *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007)). And in a case in which both parties are alleged to have breached the contract, "the party first guilty of breach of contract cannot complain if the other party thereafter refuses to perform." *Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956); *see O'Bryan v. Mengel Co.*, 6 S.W.2d 249, 251 (Ky. 1928) ("No principle in the law of contracts is better settled than that the breach of an entire indivisible contract in a material particular excuses further performance by the other party and precludes an action for damages on the unexecuted part of the contract.").

"The construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. App. 2000) (citing *Hibbitts v. Cumberland Valley*

*Nat. Bank & Tr. Co.*, 977 S.W.2d 252, 254 (Ky. App. 1998)). An "ambiguous contract" is one capable of more than one reasonable interpretation. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). "If an ambiguity exists, the court may look to extrinsic evidence to determine the intent of the parties." *Principal Life Ins. Co. v. Doctors Vision Ctr. I, PLLC*, No. 5:12-CV-00125-JHM, 2014 WL 6751201, at *6 (W.D. Ky. Dec. 1, 2014) (citation omitted). If a contract is unambiguous, however, it "will be enforced strictly according to its terms." *Elmore v. Com.*, 236 S.W.3d 623, 627 (Ky. App. 2007) (citations omitted). "[A] court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear*, 103 S.W.3d at 106 (citation omitted). In other words, "[i]f there is no ambiguity, the court's analysis extends only to the four corners of the contract to determine the parties' intention." *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 887 (E.D. Ky. 2014) (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)).

Here, Plaintiffs agree that the Agreement is unambiguous. [DE 51 at 496; DE 57 at 623 ("Plaintiffs . . . do not assert that an ambiguity exists in the Agreement.")]. Indeed, the Agreement explicitly states that "the Program is patented under a patent issued to the Licensor under the name, PERSONALLY ADAPTIVE JOINT THRESHOLD TRAINING ('PAJTT Program')." [DE 39-1 at 255]. Plaintiffs instead point out that "it is well-established that the parol evidence rule does not apply to contracts procured by fraud." [DE 57 at 623 (citing *Caudill v. Acton*, 175 S.W.3d 617, 620 n.8 (Ky. App. 2004))]; *see also Slone v. Johnson*, No. 2004-CA-002139-MR, 2006 WL 891105, at *2 (Ky. App. Apr. 7, 2006); *Stallard v. Adams*, 228 S.W.2d 430, 431 (Ky. App. 1950).

Plaintiffs are correct that the parol evidence rule does not apply in this case, which includes an allegation of fraudulent misrepresentation. Defendants assert that Plaintiffs "representations (sic) the PAJTT Program was the subject of a patent, and representations that [Dr.] House owned

all rights in the know-how were material false statements relied upon by Counterclaim Plaintiffs to the (sic) detriment." [DE 40 at ¶ 49]. In other words, Defendants assert that Plaintiffs fraudulently induced them—even though no patent had issued—into signing the Agreement. As a result, the parol evidence rule does not limit the Court to the four corners of the Agreement in determining whether Defendants knew no patent had issued when they executed the Agreement.

On this issue, Plaintiffs assert that Defendants knew there was no patent when they executed the Agreement. Plaintiffs reference a PDI document that states in the footer "(TM) Velocity Plus – Patent Pending" and a letter from January 13, 2013, in which Dr. House informed PDI that to receive "proper consideration and/or recognition," he had applied for a patent to do "what is right with full disclosure and fairness in an agreement." [DE 43-5 at 424-425; DE 57 at 622-625]. Plaintiffs contend "it is [thus] unequivocally clear from the undisputed evidence of record that Defendants not only failed to rely on [the Agreement's language about a patent]— *which was drafted by the attorneys of Defendants*—but in fact had sufficient notice and knowledge that the patent was still in the application process when the Agreement was executed." *Id.* at 623 (emphasis in original).

Defendants, on the other hand, have testified that they did not know there was no patent until November 4, 2014—about eight months after executing the Agreement. [DE 51-4 at 575]. They contend that the PDI document's inclusion of "patent pending" is not "a reference to the PAJTT Program, but is a reference to Players' VELOCITY PLUS trademark, an application for registration of which *as a trademark* was then pending with the U.S. Patent & Trademark Office. The reference to '(TM) Velocity Plus- Patent Pending,' had nothing to do with the PAJTT Program." [DE 51 at 482–83] (emphasis in original). Defendants argue that the January 2013

letter was sent over a year before execution of the Agreement, and the Agreement made clear that the program had since been patented. *Id.* at 483.

Given these factual disputes, summary judgment is inappropriate. There remain genuine issues of material fact about the threshold issue of whether Defendants knew a patent had not issued when they executed the Agreement. Determining this will require factual and credibility determinations by a jury. *Adams*, 31 F.3d at 385 ("[T]he district court is not to make credibility determination or weigh the evidence"). Because there are genuine issues of material fact about the threshold issue of consideration, the Court need not consider whether Defendants breached the Agreement. The Court will deny Plaintiffs' motion on Count I.

### 2. Trademark Infringement and Unfair Competition (Counts III, IV, V, VI, VII, VIII, IX, and X)

Next, Plaintiffs bring both Lanham Act and common law trademark and unfair competition claims against Defendants. "Because Kentucky common law tracks federal law in this area, [the Court] applies a uniform framework." *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 856 (6th Cir. 2018) (citing *Oaklawn Jockey Club, Inc. v. Kentucky Downs, LLC*, 687 F. App'x 429, 433 (6th Cir. 2017)).

"The Lanham Act makes any person who uses 'any word, term, name, symbol, or device' in a way that is 'likely to cause confusion, or to cause mistake, or to deceive as to . . . affiliation, connection, or association' liable to a senior trademark owner." *Id.* at 856–57 (citing 15 U.S.C. §§ 1125(a)(1)(A), 1114). "To prevail upon a trademark infringement and unfair competition claim, [the plaintiff] must establish that [the defendant's] trademark creates a likelihood of confusion regarding the origin of goods or services offered by the respective parties." *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 424 (6th Cir. 2017) (citations omitted).

As a threshold matter, however, only certain marks are protectable. This is based partially on whether it is "generic, descriptive, suggestive, and fanciful or arbitrary." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002) (internal quotation marks omitted). "Generic terms can never be trademarks, descriptive terms are not inherently distinctive[,] and suggestive, arbitrary[,] and fanciful terms are regarded as being inherently distinctive." § 11:2 Spectrum of distinctiveness of marks—Placement of candidates on the spectrum, 2 MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 11:2 (5th ed.). Unlike arbitrary and fanciful marks, which are inherently distinctive and thus entitled to protection, "[a] descriptive mark, by itself, is not protectable." *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 730 (6th Cir. 2012). But a descriptive mark can become protectable "by acquiring a secondary meaning." *Id.* (internal quotation marks and ellipses omitted). A mark acquires secondary meaning when, "in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982).

Here, the parties dispute Defendants' use of two marks: (1) the NPA Trademark, and (2) Dr. House's name. [DE 43-1 at 356-366; DE 51 at 502-510]. As for the marks' placement on the spectrum of distinctiveness, "once a mark has been registered for five years, the mark must be considered strong and worthy of full protection." *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 600 (6th Cir. 1991) (citation omitted). Plaintiffs argue that the NPA Trademark has been registered since 2007 and thus become incontestable under 15 U.S.C. § 1065. [DE 43-1 at 347]. An incontestable mark "is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Wynn*, 943 F.2d at 600 (citation omitted).

NPA has owned the federally registered NPA Trademark since 2007. [DE 39-2]. That said, the registration only protects the NPA Trademark's use in "clothing, namely, baseball jerseys,

pants, and hats." *Id.* Although the registration formerly covered "pre-recorded DVDs and videotapes featuring baseball pitching instruction," Plaintiffs abandoned that portion of the registration upon renewal. [*See* DE 51-12 at 603–04; DE 57 at 630]. Because the NPA Trademark's registration for clothing does not cover the mark's use to promote baseball pitching instruction, the mark is not incontestable for these purposes.

Defendants argue that because the protection for DVDs and videotapes lapsed and the registration does not cover baseball pitching instruction, there is no infringement as a matter of law. [DE 51 at 494 ("Players' does not, and never has marketed any baseball jerseys, pants, or hats, or any related products bearing the mark, so as a matter of law there has been no infringement of the trademark registration")]. This is incorrect. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ("Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks . . . but it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).") (internal citations and quotation marks omitted). Although the NPA Trademark is no longer registered for baseball pitching instruction and therefore not incontestable under 15 U.S.C. § 1065, Plaintiffs may still be entitled to protection if they can show that the mark is suggestive or arbitrary (and thus inherently distinctive) or is descriptive (and thus protectable upon a showing of secondary meaning).

Suggestive marks are often difficult to distinguish from descriptive marks because both are intended to refer to the goods and services in question. "A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Induct-O-Matic Corp. v.*

*Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984) (citations and quotation marks omitted).

By contrast, a "merely descriptive term specifically describes a characteristic or ingredient of an article." *Id.* "If the mark imparts information directly, it is descriptive." *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 594 (6th Cir. 1989) (citation omitted). A mark is descriptive if it conveys "the intended purpose, function or use of the goods . . . the class of users of the goods; a desirable characteristic of the goods; or the end effect upon the user." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 (6th Cir. 1988).

The NPA Trademark consists "of a silhouette of a pitcher with a[n] [overhead] swoosh." [DE 39-2]. To market baseball pitching instruction, the mark "imparts information directly" that the service relates to baseball pitching, *Burke-Parsons-Bowlby Corp.*, 871 F.2d at 594, and it does not "require[] the observer or listener to use imagination and perception to determine the nature of the goods," *Induct-O-Matic Corp.*, 747 F.2d at 362. There is not a high degree of imagination that a typical buyer must employ to imagine the nature of Plaintiffs' services; buyers would not need to engage in a "multi-stage reasoning process" to cull information about Plaintiffs' service; others would likely want to use the mark to describe their own products; and the mark is unlikely "to conjure up some other, purely arbitrary connotation." *See DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 510–11 (6th Cir. 2004) (endorsing the district court's use of Professor McCarthy's test for determining whether a mark is descriptive).[2] The NPA Trademark is therefore descriptive and Plaintiffs must establish secondary meaning to obtain protection. *Id.* at 513.

---

[2] The McCarthy factors include:

> 1) How much imagination on the buyer's part is required in trying to cull a direct message about the quality, ingredients, or characteristics of the product or service? [I]t must be kept in mind that the ordinary consumer does not spend much time in the marketplace lingering over such problems. On the other hand, if the potential buying class at issue are experts or professionals, a more critical examination is reasonable.

Secondary meaning is a question of fact, and "[t]he evidentiary burden necessary to establish secondary meaning is substantial." *Degidio*, 355 F.3d at 513 (citation omitted). Courts in this Circuit evaluate seven factors to determine whether a mark has acquired secondary meaning: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Id.* (citations omitted). "The best direct evidence of secondary meaning is expert testimony based upon a properly designed and conducted consumer survey report." *Ashland Oil, Inc. v. Olymco, Inc.*, 905 F. Supp. 409, 413 (W.D. Ky. 1994), *aff'd*, 64 F.3d 662 (6th Cir. 1995).

At this stage, Plaintiffs have presented no consumer testimony or consumer surveys showing that the NPA Trademark has acquired secondary meaning. Nor have Plaintiffs submitted evidence related to the other relevant factors. Plaintiffs have thus not met their "substantial"

---

2) Does the mark directly convey a real and unequivocal idea of some characteristic, function, quality or ingredient of the product or service to a reasonably informed buyer? . . . Is some reflection or multi-stage reasoning process necessary to cull direct information about the product from the term used as a mark?

3) Does the mark so closely tell something about the product or service that other sellers of like product would be likely to want to use the term in connection with their goods? [W]ithout any prior knowledge of this mark, [would] others . . . be likely to want to use it to describe their products?

4) Are . . . other sellers now using this term to describe their products? Even if the mark is descriptive and has attained secondary meaning, if many others in other product markets are using this term, the mark may be labelled "weak" and entitled only to narrow protection.

5) Even though the mark may tell something about the goods or services, is it just as likely to conjure up some other, purely arbitrary connotation? E.g., SUGAR & SPICE baked goods, or POLY PITCHER plastic pitchers.

6) How does the mark fit into the basic concept that descriptive marks cannot pinpoint one source by identifying and distinguishing only one seller? That is, are buyers likely to regard the mark really as a symbol of origin, or merely as another form of self-laudatory advertising?

*Degidio*, 355 F.3d at 510–11 (citing 2 MCCARTHY § 11:71).

burden of establishing secondary meaning for the NPA Trademark, and their motion is denied as to the NPA Trademark.

As to Dr. House's name, there is no registered mark in dispute, but Plaintiffs argue the name is still protectable because "[t]here is strong evidence that Dr. House's name is a suggestive mark because it serves to identify the source of the PAJTT Program." [DE 43-1 at 358].

The Lanham Act provides that a mark that is "primarily merely a surname" is not registrable as a trademark unless there is adequate proof of widespread consumer recognition of the surname as a trademark. *See* 15 U.S.C. §§ 1052 (e)(4), (f). This limit on allowing a party to receive trademark protection for a surname "reflects the common law that exclusive rights in a surname *per se* cannot be established without evidence of long and exclusive use which changes its significance to the public from a surname of an individual to a mark for particular goods or services." *In re Etablissements Darty Et Fils*, 759 F.2d 15, 17 (Fed. Cir. 1985). Similarly, Kentucky law instructs that "a family surname is incapable of exclusive appropriation in trade." *Colston Inv. Co. v. Home Supply Co.*, 74 S.W.3d 759, 767 (Ky. App. 2001). The Sixth Circuit has held similarly for an individual's likeness. *See ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 922 (6th Cir. 2003) ("We hold that, as a general rule, a person's image or likeness cannot function as a trademark."); *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 755 (6th Cir. 1998); *see also Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir. 1990) ("Personal names used as trademarks are generally treated as descriptive terms, since a name might be regarded as a convenient description of the fact that the individual was affiliated with the firm . . . . As with all descriptive marks, they are thus protected only if, through usage, they have acquired distinctiveness and secondary meaning." (internal citations and quotation marks omitted)).

As with the NPA Trademark, Plaintiffs fail to show widespread consumer recognition that Dr. House's name primarily identifies the source of his services. Plaintiffs only state that "Dr. House's name suggests unique and successful science-based programs designed to improve arm strength without increasing the risk of injury," and that Defendants' decision to include Dr. House's name on the PDI website conveys that Dr. House is "the origin of a product." [DE 43-1 at 359]. This falls far short of what is needed to show that Dr. House's name has acquired secondary meaning. *See Degidio*, 355 F.3d at 513. Plaintiffs' motion is therefore denied as to Dr. House's name.

**B.     Defendants' Cross-Motion for Partial Summary Judgment**

In their Counterclaim, Defendants outline nine Counts against Plaintiffs: fraud (Count I); breach of contract (Count II); conditional alternative claim for rescission (Count III); disparagement and trade libel (Count IV); defamation (Count V); federal unfair competition (Count VI); common law unfair competition and deceptive trade practices (Count VII); tortious interference with contract (Count VIII); and tortious interference with prospective business advantage (Count IX). [DE 40 at ¶¶ 48–74]. Defendants now move for summary judgment on Counts II[3], IV, V, VIII, and IX. [DE 67].

### 1.   Disparagement and Trade Libel (Count IV)

Defendants bring a claim for disparagement and trade libel, alleging that Plaintiffs "defamed the quality of the Newtons' program" by sending an email in October 2015, which "made false statements about athletes being injured" and attacked "the quality with which the Newtons followed the PAJTT Program." [DE 72 at 858].

---

[3] As with Plaintiff's breach claim, the threshold question of whether there was consideration (and thus a valid contract) requires factual and credibility determinations by a jury. As a result, the Court will deny Defendants' motion on Count II.

Plaintiffs disagree, arguing "Defendants have failed to establish that Plaintiffs disparaged the quality of Defendants' property. The evidence of record strongly indicates that any statements published by Plaintiffs about Defendants' Velocity Plus program were truthful and/or that Plaintiffs possessed a qualified privilege to make such statements." [DE 71 at 764].

"Disparagement, or trade libel, is akin to defamation under Kentucky law." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 269 (6th Cir. 2010) (citing *Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 872 (Ky. App. 2007). To prove disparagement, a plaintiff must show that the defendant "publishe[d] a false statement that disparages 'the quality of [plaintiff's] land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property.'" *Kenney*, 269 S.W.3d at 873 (quoting Restatement (Second) of Torts § 626 (1977) (incorporating § 623A)).

Here, as detailed below, there is a genuine issue of material fact about the truthfulness of Plaintiffs' statements in the October 2015 and thus the Court denies summary judgment on this Count.

## 2. Defamation (Count V)

Defendants bring a defamation claim against Plaintiffs, alleging that Plaintiffs' statements are defamatory "because the claim that the Newtons and their business were harming young players does nothing other than to deter the third-party recipients of the e-mail from doing business with Players." [DE 67-1 at 721]. Plaintiffs argue, among other things, that they are "shielded from liability" because the statements in the October 2015 email are true. [DE 71 at 757].

To establish a prima facie case of defamation, the moving party must show: 1) "defamatory language"; 2) "about [them]" 3) "which is published"; and 4) "which causes injury to reputation."

*Stringer v. Wal–Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004) (citing *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 273 (Ky. App. 1981)). Defamatory language may be actionable *per se* or *per quod*: if *per se*, "damages are presumed and the person defamed may recover without allegation or proof of special damages"; and, if *per quod*, "recovery may be sustained only upon an allegation and proof of special damages." *Scheel v. Harris*, No. CIV.A. 3:11-17-DCR, 2012 WL 3731263, at *4 (E.D. Ky. Aug. 28, 2012) (quoting *Hill v. Evans*, 258 S.W.2d 917, 918 (Ky. 1953)). "Special damages are those beyond mere embarrassment which support actual economic loss." *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 274 (Ky. App. 1981). "One example of this *per se* classification is a communication involving false allegations of unfitness to perform a job." *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014), as corrected (Apr. 7, 2015). Published words, then, "are actionable per se if they directly tend to the prejudice or injury of any one in his profession, trade or business." *Tucker v. Kilgore*, 388 S.W.2d 112, 114 (Ky. 1964) (finding as defamation *per se* statement about police officer that he was "of limited traning (sic), no culture and a professional moocher, who strikes you for 50c or a dollar every time he meets you on the streets").

### a. *Prima facie case for defamation*

Defendants[4] contend that they have satisfied all elements required to establish a prima facie case for defamation *per se*. [DE 67-1 at 719]. The Court finds that the Newtons have established a prima facie case for both defamation *per se* and defamation *per quod*, and Players' Dugout has established a prima facie case for defamation *per quod*.

Plaintiffs' statements in the October 2015 email were defamatory. Defendants train baseball players to throw faster, harder, and farther. Plaintiffs emailed NPA certified coaches, a

---

[4] Defendants are Joseph A. Newton ("Joe Newton"), Joseph John Newton ("Joseph Newton") (collectively, the "Newtons"), and Players' Dugout, Inc.

referral source for Defendants. The October 2015 email, which alleges that "several of [Defendants] customers have been hurt," would tend to prejudice Defendants' business and injure their reputation. [DE 51-10 at 598]. A trainer who hurts his clients is unfit to perform his job, and Kentucky appellate courts have repeatedly found *per se* defamation when "a communication involv[es] false allegations of unfitness to perform a job." *Toler*, 458 S.W.3d at 282; *Fortney v. Guzman*, 482 S.W.3d 784, 789 (Ky. App. 2015) ("When the communication concerns untrue allegations of . . . unfitness to perform a job, the communication is libelous per se or slanderous per se." (internal quotation marks and citations omitted)); *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. App. 2006) ("Statements classified as defamatory per se include those which attribute to someone . . . conduct which is incompatible with his business, trade, profession, or office." (citing Restatement (Second) of Torts § 570 (1977))). The first element of a claim for defamation is thus satisfied.

Defendants have satisfied the second ("about [them]") and third ("which is published") elements. *Stringer*, 151 S.W.3d at 793 (Ky. 2004). The October 2015 email specifically references "Joe Newton and his company, Velocity Plus," and was published via electronic mail to NPA certified coaches. [DE 51-10 at 598].

Finally, Defendants have satisfied the fourth element ("which causes injury to reputation"). Defendants have adduced proof, in the form of a report by a forensic economist, that they lost profits because of the defamatory statements made in the October 2015 email. [*See* DE 42-1 at 327-29. Thus, the Newtons and Players' Dugout have proven special damages as required to established a prima facie case for defamation *per quod*.[5] In addition, as discussed above, because

---

[5] Player's Dugout has not established a prima facie case for defamation *per se* because the statements in the October 2015 do not "contain an imputation of fraud, deceit, dishonesty, or other reprehensible conduct." *See White v. Hanks*, 255 S.W.2d 602, 603 (Ky. 1953) ("[D]isparaging words spoken with reference to goods sold by a merchant are not actionable per se unless the words contain an imputation of

the statements in the October 2015 email "directly tend to the prejudice or injury of" the Newtons in their "profession, trade or business" of training baseball players, the Newtons have also proven defamation *per se* and special damages are presumed. *See Scheel*, 2012 WL 3731263 at *4.

As Defendants have established a prima facie case of defamation, the Court next considers whether the statements in the October 2015 email were true.

### b. Truth of the Statements in the October 2015 email

In Kentucky, "truth is a complete defense[,] and thus a [party] able to prove the truth of the defamatory statement at issue cannot be held liable for defamation." *Hodges v. Ford Motor Co.*, 272 F. App'x 451, 454 (6th Cir. 2008) (quoting *Stringer*, 151 S.W.3d at 795–96 (internal citations and quotation marks omitted).

Plaintiffs argue that Defendants have failed to establish that the allegedly defamatory statements in the October 2015 email were false.[6] [DE 71 at 757]. Plaintiffs also proffer evidence that the statements were, in fact, true. *Id.* Plaintiffs argue that Dr. House's deposition testimony supports the truthfulness of the statements in the October 2015 email because, based on that testimony, "Plaintiffs [were] aware of at least three participants in Defendants' program being injured":

> Question: Have you become aware of—of a number of athletes that were injured by the Players' Dugout process?

---

fraud, deceit, dishonesty or other reprehensible conduct on the part of the merchant."; *See also Jae Enterprises, Inc. v. Oxgord Inc.*, No. 5:15-CV-228-TBR, 2016 WL 865328, at *10 (W.D . Ky. Mar. 2, 2016) (quoting *CMI,* 918 F. Supp. at 1084 ("Businesses do not have personalities that are hurt so intangibly. If a business is damaged, the damage is usually reflected in the loss of revenues or profits. Therefore, courts should be very cautious about labeling as defamation per se comments made about a corporation or its products").

[6] Plaintiffs also argue that Defendants have: 1) "not alleged that Plaintiff House, in his individual capacity, made any defamatory statements: 2) "failed to establish that Plaintiffs did not possess a qualified privilege to publish the allegedly defamatory statements; 3) "presented no evidence that [Plaintiffs] possessed the culpable state of mind to be liable for defamation." [DE 71 at 757-759]. Because, as discussed below, the Court finds that there is a genuine issue of material fact about whether the statements were true, the Court need not consider Plaintiffs' other arguments.

Answer: Not—I'm not aware on the low end of injuries. **But sharing with Joe, and Joe and I talked all the time, and his top three guys, all special—really elite guys, are the Delabar kid, your secretary's son, and Stick, the great big kid with the great arm.** All of them were either having elbow—Delabar was having a shoulder issue . . .

[DE 71-3 at 797-798]  (emphasis added).

Plaintiffs imply that—because these "elite guys" are the "customers" discussed in the October 2015 email—the statements in the October 2015 email were true.  Plaintiffs also argue that two emails from August 2015 (one from Robert Hurley and one from Mark Sheehan) prove that the statements in the October 2015 email were true. [DE 71 at 757-758].  Plaintiffs argue that, taken together, these two emails create a genuine issue of material fact: "Although the [August] email is not definitive proof that Defendants' deviations from the Program's protocols directly injured the young players in Maryland, its temporal proximity to such deviations unequivocally creates a disputed issue of material fact as to the truth of the statements in the October email." [DE 71 at 758].

But there is evidence in the record that the defamatory statements in the October 2015 email were false.  Hurley was likely not referring to Defendants in his email.  [*See* DE 71-9].  In fact, as conceded by Dr. House, he was likely referring to Jamie Evans:

> Question: You would have known, based upon Salisbury, Maryland, that this is related to Jamie Evans' program, is that correct?
>
> Answer: I'm—I'm guessing because Salisbury, Maryland is where Jamie is located.

[DE 72-1 at 862-863] (emphasis added).

Jamie Evans was not associated with Defendants' program.  Rather, as Defendants informed Plaintiffs in a June 2015 email, he was pirating it.  [DE 51-8 at 581].  Thus, Robert Hurley's email, which documents injuries to baseball players in Salisbury, does not support

22

Plaintiffs' argument because Defendants could not be responsible for the injuries sustained by baseball players there who were participating in Jamie Evans' pirated version of the PAJTT program. Likewise, Mark Sheehan's email, which details his concerns after visiting the Defendants' Elizabethtown facility, does not support the Plaintiffs' argument because it does not allege that Defendants' deviations caused any injuries. [DE 71-4 at 805]. Moreover, Sheehan testified that he did not "know of any players that were hurt by the Newtons." [DE 72-2 at 869]. The August 2015 emails thus do not create a genuine issue of material fact about whether the statements in the October 2015 email were true.

That said, drawing all reasonable inferences in a light most favorable to Plaintiffs, a jury could find in Plaintiffs' favor if they believe that the "customers" referred to in the October 2015 email were the "elite guys" mentioned by Dr. House in his deposition testimony. [*See* DE 51-10 at 598 ("[A]s a possible result of his changes and omissions, we have learned that several of his customers have been hurt"); DE 71-3 at 797-798 ("But sharing with Joe, and Joe and I talked all the time, and his top three guys, all special—really elite guys, are the Delabar kid, your secretary's son, and Stick, the great big kid with the great arm. All of them were either having elbow—Delabar was having a shoulder issue"); *Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193, 198 (Ky. 2010) ("[S]ummary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor") (quoting *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky.App.2001); *see also Hodges v. Ford Motor Co.*, 272 F. App'x at 458 ("While the weight of the evidence might appear to favor the Defendants, it cannot be said that [Plaintiff's] version is wholly implausible. Where the evidence on the question of falsity is conflicting, the questions of whether the statements were false [is] . . . for the factfinder to decide under Kentucky law"). Thus, because the "evidence on the question of

falsity is conflicting," the Court finds that Plaintiffs have created a genuine issue of material fact about whether the statements in the October 2015 email were true, and summary judgment will be denied on this Count. *Id.*

### 3. Tortious Interference with Contract and Prospective Business Advantage (Counts VIII–IX)

Finally, Defendants allege claims for tortious interference with contract and tortious interference with prospective business advantage. [DE 40 at 302–303; DE 67-1 at 721–23]. Defendants argue that the "October 2015 E-mail and other direct contact with Players' customers had no other purpose but to encourage the customers to sever their relationship with the Newtons . . . Moreover, the Plaintiffs had no legal or equitable right to interfere in these relationships because the recipients of the E-mail were independently affiliated with both the Plaintiffs and the Newtons." [DE 67-1 at 723]. Defendants assert that Dr. House told Sheehan to stop working with Defendants, which he did. *Id.* Defendants further argue that they "had contracts with its distributors at the time the NPA and House issued the defamatory October 2015 E-mail . . . This resulted in a substantial drop in business immediately following the October 2015 E-mail where ten providers out of fifteen evaporated overnight." [DE 72 at 857]. Plaintiffs disagree, arguing that "Defendants have not presented a single contract that existed and was breached by a third party as a result of the October 2015 email," "Defendants . . . ignore that they ceased paying royalties to Plaintiffs in breach of the Agreement months prior to the October 2015 email," and "Defendants' deviations from the Program's protocols exposed Plaintiffs to substantial reputational and legal risk." [DE 71 at 760-761].

To establish tortious interference with contract, a claimant must show "(1) the existence of a contract; (2) [the defendant's] knowledge of the contract; (3) that [the defendant] intended to cause a breach of that contract; (4) that [the defendant's] actions did indeed cause a breach; (5)

that damages resulted to [the plaintiff]; and (6) that [the defendant] had no privilege or justification to excuse its conduct." *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5–6 (Ky. App. 2012) (citing *Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 619 (W.D. Ky. 2009), *aff'd sub nom. Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291 (6th Cir. 2011)).

Similarly, to establish tortious interference with prospective business advantage, the claimant must show "(1) the existence of a valid business relationship or expectancy; (2) that [the defendant] was aware of this relationship or expectancy; (3) that [the defendant] intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages." *Snow Pallet, Inc.*, 367 S.W.3d at 6 (citing *Monumental Life Ins. Co. v. Nationwide Ret. Sols., Inc.*, 242 F. Supp. 2d 438, 450 (W.D. Ky. 2003)). "This analysis turns primarily on motive." *Id.* (citing *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988). Thus, "[t]o prevail under this theory of liability, the party seeking recovery must show malice or some significantly wrongful conduct." *Id.* (internal quotation marks omitted).

Here, although the October 2015 email clearly states that Plaintiffs were "ending any affiliation with [Defendants]," it did not instruct the recipients to do so. [*See* 51-10]. Sheehan's interpretation of the October 2015 email is not dispositive about whether Plaintiffs intended to cause a breach or interfere with Defendants' contracts and relationships with NPA certified coaches. Nor is the fact that Dr. House may have instructed Sheehan to stop working with Defendants. As evidenced by Sheehan's August 2015 email to Plaintiffs, Sheehan had serious concerns about Defendants' implementation of the program months before the October 2015 email. [*See* 71-4]. Sheehan may have terminated his relationship with Defendants because Dr.

House instructed him to do so.  On the other hand, he may have done so because of his concerns about Defendants' practices.

Moreover, as discussed above, there is a genuine issue of material fact about the truthfulness of the statements in the October 2015 email.  If the statements in the October 2015 email were true, they were not fraudulent misrepresentations.  *See Ventas.*, 635 F. Supp. 2d at 622 ("Showing malice or some significantly wrongful conduct is evidence of improper conduct . . . [S]ignificantly wrongful conduct certainly includes fraudulent misrepresentation."

There thus remains a genuine issue of material fact about Plaintiffs' intent and motive. Determining this will require factual and credibility determinations by a jury.  *Adams*, 31 F.3d at 385 ("[T]he district court is not to make credibility determination or weigh the evidence").  The Court therefore denies summary judgment on these Counts.

## IV. <u>CONCLUSION</u>

For the reasons above, and being otherwise sufficiently advised, **THE COURT ORDERS AS FOLLOWS**:

(1) Plaintiffs' Motion for Partial Summary Judgment on Counts I, III, IV, V, VI, VIII, IX, and X of the First Amended Complaint [DE 43]  is **DENIED**.

(2) Defendants' Cross-Motion for Partial Summary Judgment on Counterclaim Counts II, IV, V, VIII, and IX of Defendants' Answer and Counterclaim [DE 67] is **DENIED**.

Copies to:     Counsel of record