UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DR. THOMAS HOUSE, ET AL.                    Plaintiffs/Counterclaim Defendants

v.                                          Civil Action No. 3:16-cv-00594-RGJ

PLAYERS' DUGOUT, INC., ET AL.               Defendants/Counterclaim Plaintiffs

* * * * *

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the motions in limine and other pretrial objections filed by Defendants and Counterclaim Plaintiffs, Joseph A. Newton ("Joe Newton"), Joseph John Newton ("Joseph Newton") (collectively, the "Newtons"), and Players' Dugout, Inc. ("PDI") (collectively, "Defendants"), and Plaintiffs and Counterclaim Defendants, Dr. Thomas House ("Dr. House") and the National Pitching Association, Inc. ("NPA") (collectively, "Plaintiffs"). Defendants moved in Limine to Prevent Testimony about Plaintiff House's Work with Professional Athletes [DE 97], and to Prevent Unsupported Allegations of Injuries [DE 98]. Plaintiffs moved in Limine to Exclude Certain Testimony of Newton Defendants relating to Alleged Copying of Velocity Plus Program [DE 107], and for Ruling on Objections Asserted in Deposition of Bill Schopp [DE 108]. Defendants also objected to Plaintiffs' Exhibit List for Trial [DE 117], and Plaintiffs' Identified Remote Witnesses [DE 118]. Additionally, Defendants filed a Response to Plaintiffs' Designation of Schopp and Sheehan Testimony that the Court construes as an Objection [DE 121]. The Court heard some argument from the parties on these matters at the pretrial conference. After the pretrial conference Plaintiffs filed a Report of Disagreements and Response to Defendants' Objection to Remote Witnesses [DE 125], and Defendants filed a Supplemental Objection to Plaintiffs' Proposed Remote Witnesses [DE 127]. Plaintiffs also filed

1

a Response to Defendants' Objections to Plaintiffs' Exhibit List for Trial [DE 126]. For the reasons below, the Court **GRANTS in part** and **DENIES in part** the motions and objections as set forth below.

## I.      BACKGROUND

Plaintiffs develop programs and techniques to enhance athlete performance. [DE 39 ¶ 12]. Plaintiffs have used these techniques while working with various athletes, including Hall of Fame pitcher Nolan Ryan and NFL quarterbacks Tom Brady, Drew Brees, and Andy Dalton. *Id.* Plaintiffs own the federally registered NPA Trademark, U.S. Reg. No. 3,202,667, for use in "clothing, namely, baseball jerseys, pants, and hats." [DE 39-2]. The NPA used the mark in commerce as early as 2004 and registered it on January 23, 2007. *Id.*[1]

In February 2014, Dr. House and Joe Newton, representing PDI, entered into a license agreement ("Agreement") in which Dr. House ("Licensor") granted PDI ("Licensee") an exclusive, worldwide license to train baseball and softball pitchers using the patented "Personally Adaptive Joint Threshold Training" ("PAJTT program") method. [DE 39-1 at 255]. The Agreement permitted PDI to use Dr. House's "know-how," as defined in the Agreement, for the "purpose of commercializing" the PAJTT program as the "Velocity Plus Arm Care Program ('Velocity Plus')." [DE 39 ¶14]. The Agreement does not explicitly provide for Defendants to use the NPA Trademark or Dr. House's name as part of the commercialization of the PAJTT Program. But since execution of the Agreement, PDI, with Dr. House's permission, has used the NPA Trademark and Dr. House's name on its website and other various promotional materials. [DE 39 ¶ 21].

---

[1] As filed, the registration also covered "pre-recorded DVDs and videotapes featuring baseball pitching instruction," but the NPA abandoned that protection upon renewal. [*See* DE 51-12 at 603–04].

In January 2013, a year before execution of the Agreement, Dr. House sent a letter about the PAJTT program to Joe Newton and NPA employee, James Evans. [DE 51-5]. In the letter, Dr. House claimed that he had "applied for a patent, copyright, and trademark" to protect his intellectual property. *Id.* Dr. House asked that a written agreement be drafted by February 1, 2013. *Id.* When the parties executed the Agreement over a year later, the Agreement stated that "the Program is patented under a patent issued to the Licensor under the name, PERSONALLY ADAPTIVE JOINT THRESHOLD TRAINING." [DE 39-1 at 255] (capitalization in original).

Despite the Agreement's language, Dr. House never received a patent for the PAJTT program. The parties disagree about whether Defendants knew this when they executed the Agreement. [*See* DE 43-1 at 368-69; DE 51 at 482-83].

Along with the exclusive right to use the patented training methods with baseball and softball players, the Agreement stipulated that Plaintiffs would prevent third parties from using the training program by enforcing its intellectual property rights against potential infringers. [DE 39-1 at 260]. The Agreement required the Licensor to "defend and protect all infringements upon its patent of the PAJTT Program licensed hereunder at its sole cost." *Id.* The Licensor warranted "to take *all action necessary* to restrain any third party *which the Licensee deems to be selling a product in competition with the Program* licensed to the Licensee which product appears to be an infringement of this Licensor's patent rights." *Id.* (emphasis added).

After the execution of the Agreement, PDI notified Dr. House and the NPA of multiple unauthorized providers using the PAJTT program. For instance, on November 4, 2014, Joseph Newton emailed Plaintiffs informing them that an individual in Florida was pirating the PAJTT program. [DE 51-6]. Three days later, Joseph Newton emailed Plaintiffs to share that one of NPA's regional directors was pirating the PAJTT program. [DE 51-7]. Joseph Newton again emailed

3

Plaintiffs on June 2, 2015, this time with a list of academies promoting the PAJTT program on their websites. [DE 51-8]. According to Defendants, "[t]he purpose of these notifications was to assist House and the NPA in meeting their contractual duty to [take] 'all action necessary to restrain any third party which the Licensee deems to be selling a product in competition with the Program licensed to the Licensee.'" [DE 51 at 485 (quoting [DE 39-1 at 260])]. Other than sending a few letters, Plaintiffs never sought to stop this alleged pirating, and Dr. House never investigated the alleged instances of pirating outlined in the June 2, 2015 email. [DE 51-9 at 587–92].

Under the Agreement, PDI had to pay royalties and commissions to Dr. House on the 10th day of each month. [DE 39-1 at 256–57]. The Agreement required PDI to maintain and submit reports showing the royalties and commissions payable during the month before with supporting information. *Id.* The Agreement also required PDI to maintain records in enough detail to determine royalties and commissions payable under the Agreement, as well as to permit Dr. House or a designee to examine the records during the term of the Agreement and two years thereafter. *Id.*

PDI complied with the Agreement and promptly paid all royalties and commissions. [DE 43-1 at 348]. But PDI stopped paying royalties and commissions in August 2015. *Id.* At that time, neither party sought to terminate the Agreement. [DE 39 ¶ 24]. PDI also stopped complying with the Agreement's reporting requirements, and it has not paid royalties or commissions since August 8, 2015. *Id.* ¶ 22. PDI continued to use the NPA Trademark and Dr. House's name on its website and other promotional materials. [DE 43-4 at 414–15].

Defendants claim that because Plaintiffs never patented the PAJTT Program, as outlined in the Agreement, PDI suspended payment of royalties to Dr. House and the NPA, began paying the royalties into an escrow account, and issued a formal demand for assurances that Plaintiffs

perform the contract. [DE 5-2 at 75-80]. "Because those assurances were never forthcoming, [PDI] eventually ceased even escrowing the royalty payments which would have been owing had there not been a complete failure of consideration."  [DE 51 at 487].

On October 13, 2015, Plaintiffs sent a letter to PDI purporting to cancel the License Agreement because Dr. House and the NPA "ha[d] become aware of a disturbing number of young athletes who claim to have been injured . . . [T]hese letters have [come] . . . directly from the aggrieved parties." [DE 51-11]. Plaintiffs emailed NPA certified coaches telling them that PDI's services deviated from the PAJTT program's methods and that PDI's program is not "safe and effective, and . . . we have learned that several of his customers have been hurt." [DE 51-10]. Defendants claim that they have never received information of a participant being injured because of their program [DE 51-4 at 577], and thus the statements in the October 2015 email were false.

Plaintiffs claim that the statements in the October 13, 2015 email were true because they reflected Dr. House's personal knowledge and two emails received by Plaintiffs in August 2015. [DE 71 at 757-758].   Robert Hurley ("Hurley") of Salisbury, Maryland sent the first email to Plaintiffs on August 25, 2015. In his email, Hurley claims that several youth baseball players in Salisbury were seriously injured after participating in a Salisbury native's "Velo" program. [DE 71-9 at 839-840] ("[M]any baseball players in our small rural area have paid to participate in this Salisbury native's 'Velo' program including my son . . . My son did not last long . . . because he had tremendous pain in his arm . . . However, many other youths remained and from our small area there have been upwards of 10 arm surgeries . . . I feel as if the Salisbury area is an epidemic"). Mark Sheehan ("Sheehan"), an NPA affiliate, sent the second email to Plaintiffs on August 26, 2015. In his email, Sheehan writes that, after visiting the "Newton's facility in Elizabethtown," he

5

was "taken aback" by Defendants' deviations from proper protocols and "naivete when it comes to proper instruction or understanding of mechanics." [DE 71-4 at 805].

On February 6, 2016, Plaintiffs sent written notice of PDI's alleged breach of the Agreement, as required by the procedures outlined in the Agreement. [DE 39-1 at 259; DE 43-5 at 429]. The letter notified Defendants of Plaintiffs' intent to terminate the Agreement if the default was not cured within sixty days. [DE 43-5 at 429]. The letter also reiterated that Defendants could prevent termination of the Agreement within ninety days of the notice with a payment of $500,000 to Plaintiffs under the Agreement's liquidated damages clause. *Id.* Defendants acknowledged receipt of the letter and responded by phone call. [DE 43-4 at 420–21]. Defendants still admit that such royalties have not been paid. *Id.*

On June 29, 2016, Plaintiffs notified PDI that given its alleged breach of the Agreement, PDI had thirty days to pay Dr. House the $500,000 in liquidated damages and cure its nonpayment of royalties to Dr. House if it wished to override and prevent termination of the Agreement. [DE 39-3 at 267].

On September 14, 2016, Plaintiffs sued Defendants in this Court. [DE 1]. In their Amended Verified Complaint, Plaintiffs outline thirteen separate Counts against Defendants:  breach of license agreement and failure to pay royalties against PDI (Count I); breach of agreement and injunctive relief against PDI (Count II); federal trademark infringement against PDI (Count III); federal trademark infringement against the Newtons (Count IV); unfair competition against PDI under the Lanham Act (Count V); unfair competition against the Newtons under the Lanham Act (Count VI); common law trademark infringement against PDI (Count VII); common law trademark infringement against the Newtons (Count VIII); common law unfair competition against PDI (Count IX); common law unfair competition against the Newtons (Count X); unjust

enrichment against PDI (Count XI); and unjust enrichment against the Newtons (Count XII). [DE 39 ¶¶ 36–83]. Plaintiffs also seek punitive damages (Count XIII).  [*Id.* ¶¶ 84–87].

Defendants counterclaimed on January 3, 2018. [DE 40]. In their Counterclaim, Defendants outline nine Counts against Plaintiffs:  fraud (Count I); breach of contract (Count II); conditional alternative claim for rescission (Count III); disparagement and trade libel (Count IV); defamation (Count V); federal unfair competition (Count VI); common law unfair competition and deceptive trade practices (Count VII); tortious interference with contract (Count VIII); and tortious interference with prospective business advantage (Count IX). [DE 40 ¶¶ 48–74].

The parties moved for partial summary judgment. [DE 43; DE 67]. The Court ruled on the motions for partial summary judgment. [DE 78].

## II.  STANDARD ON MOTIONS IN LIMINE

Federal district courts have the power to exclude irrelevant, inadmissible, or prejudicial evidence in limine under their inherent authority to manage trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citing Fed. R. Evid. 103(c)); *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013). That said, the "better practice" is to defer evidentiary rulings until trial unless the evidence is clearly inadmissible on all potential grounds. *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975); *Jonasson v. Lutheran Child  & Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997); *Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 810 (N.D.Ohio 2002) (citing *Luce,* 469 U.S. at 41 n. 4). This posture is favored so that "questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Gresh v. Waste Servs. of Am., Inc.*, 738 F. Supp. 2d 702, 706 (E.D. Ky. 2010). When this Court issues a ruling in limine, it is "no more than a preliminary, or advisory, opinion." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994) (citing *Luce*, 713 F.2d at 1239). Thus, even where a motion in limine is denied, the

7

Court may return to its previous ruling at trial "for whatever reason it deems appropriate." *Id.* (citing *Luce*, 713 F.2d at 1239). Likewise, the Court has discretion to alter or amend a prior in limine ruling at trial. *Luce*, 469 U.S. at 41–42.

## III.    DISCUSSION

The Court will address the various motions in limine and evidentiary objections below.

### A. <u>Defendants' Motion in Limine to Exclude Evidence of Dr. House's Work with Professional Athletes</u> [DE 97].

Defendants move the Court to exclude Dr. House from mentioning or introducing evidence that celebrity/professional athletes use the PAJTT Program. Defendants argue that Dr. House's work with well-known professional athletes is irrelevant to any fact of consequence and would result in unfair prejudice and jury confusion.

### 1. *Background*

Plaintiffs have used the PAJTT Program techniques while working with various athletes, including Hall of Fame pitcher Nolan Ryan and NFL quarterbacks Tom Brady, Drew Brees, and Andy Dalton. [DE 39 ¶ 12]. Defendants argue that Dr. House's work with professional athletes is not probative of any question of fact under Fed. R. Evid. 401's test for relevance. Defendants assert that Dr. House's work with professional athletes has no bearing or probative value on the merits of the parties claims which involve breach of contract and various business torts. They argue Dr. House's specific credentials as a sports medicine physician are not in issue in this case. Defendants assert that even if Dr. House's work with professional athletes were relevant, it could confuse the issues and mislead the jury into believing Dr. House is more credible or trustworthy.

Plaintiffs respond that Dr. House's work with well-known athletes is relevant to Plaintiffs' trademark claims, specifically, the factual and legal issues relating to the "secondary meaning" associated with his name. [DE 122]. Plaintiffs argue, Dr. House's credentials and success in the

sports training and arm care field, including his work with professional athletes, is relevant to his claims for unfair competition. After the License Agreement was terminated, Plaintiffs argue Defendants continued to associate Dr. House's name as the source of Defendants' own Velocity Plus Arm Care program. Plaintiffs say Defendants did so even after they were allegedly defamed by the NPA. Plaintiffs state Defendants took this action because they were aware of Dr. House's reputation as the foundational source of successful arm care training and injury prevention programs. Finally, Plaintiffs argue any prejudice is not unfair or outweighed by relevance and the jury can assess Dr. House's credibility.

### 2. Standard

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The Court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### 3. Analysis

Plaintiffs assert trademark claims related to Dr. House's name, which is unregistered. To prevail on Plaintiffs' trademark claims for Dr. House's name, Plaintiffs will have to prove to the jury that Dr. House's name has acquired secondary meaning. [DE 78 at 900-02]. In deciding whether Dr. House's name acquired secondary meaning, the jury may consider:[2] (1) direct consumer testimony; (2) exclusivity, length, and manner of use; (3) amount and manner of

---

[2] The best direct evidence of secondary meaning is expert testimony based on a properly designed and conducted consumer survey report. *Ashland Oil, Inc. v. Olymco, Inc.*, 905 F. Supp. 409, 412-13 (W.D. Ky. 1994). No consumer survey report was conducted in this case. [DE 116 at 1267].

advertising; (4) amount of sales and number of customers; (5) established place in the marketplace; and (6) proof of intentional copying. [DE 78 at 900]; *Ashland Oil,* 905 F. Supp. at 413.

The parties did not analyze these factors in their briefing on this motion but Dr. House's work with professional athletes could be relevant to whether his name acquired secondary meaning under the second, third, fourth, and fifth elements mentioned above. Dr. House's work with professional athletes may also be relevant to Plaintiffs' claims for unfair competition under the Lanham Act and Kentucky common law for the reasons argued by Plaintiffs. The relevance of this evidence outweighs any risk that the jury would find Dr. House more credible as a result of his work with professional athletes. Defendants' Motion in Limine to Exclude Evidence of Dr. House's Work with Professional Athletes [DE 97] is **DENIED**.

### B. <u>Defendants' Motion in Limine to Prevent Unsupported Allegations of Injuries</u> [DE 98].

#### A. *Background*

Defendants bring a defamation claim against Plaintiffs for statements NPA made in an October 2015 email, which stated in part:

> Effective immediately, NPA has ended its affiliation with, and endorsement of, Joe Newton and his company, Velocity Plus . . . we learned that he was nu using all of the protocols that make the program safe and effective, and told him so repeatedly. He has refused to change and comply with the full program, and as such markets a form of our work that we cannot endorse or defend; **indeed, as a possible result of this changes and omissions, we have learned that several of his customers have been hurt . . .**"

[DE 71-10 (emphasis added)]. Dr. House did not make this statement. It was written by Gary Adornato and sent by Alex Marney, representatives of NPA, on behalf of NPA. [DE 116 at 1219]. Dr. House is identified on Plaintiffs' witnesses list and is expected to testify, among other things, about "Defendants' failure to follow the proper protocols for the licensed program, thereby

increasing the risk of potential injury to athletes" and "his non-disparagement of the Defendants."

[DE 105].

Defendants argue that Dr. House testified during his deposition that "I'm not aware on the low end of injuries[]" (House Dep. at 184:17-19), which shows that Dr. House has no evidence that Defendants ever caused "low end of injuries." [DE 98].

> Question:  Have you become aware of—of a number of athletes that were injured by the Players' Dugout process?
>
> Answer:  Not—I'm not aware on the low end of injuries.  **But sharing with Joe, and Joe and I talked all the time, and his top three guys, all special—really elite guys, are the Delabar kid, your secretary's son, and Stick, the great big kid with the great arm.** All of them were either having elbow—Delabar was having a shoulder issue . . .

[DE 71-3 at 797-798]  (emphasis added).   In ruling on the parties' cross-motions for summary judgment and denying Plaintiffs' motion for summary judgment on Defendants' defamation claim, the Court held

> That said, drawing all reasonable inferences in a light most favorable to Plaintiffs, a jury could find in Plaintiffs' favor if they believe that the "customers" referred to in the October 2015 email were the "elite guys" mentioned by Dr. House in his deposition testimony. [*See* DE 51-10 at 598 ("[A]s a possible result of his changes and omissions, we have learned that several of his customers have been hurt"); DE 71-3 at 797-798 ("But sharing with Joe, and Joe and I talked all the time, and his top three guys, all special—really elite guys, are the Delabar kid, your secretary's son, and Stick, the great big kid with the great arm. All of them were either having elbow—Delabar was having a shoulder issue").

[DE 78 at 908].

Defendants assert that Plaintiffs offered five sources of alleged proof that their injury allegations were true. Defendants assert that the Court ruled in its Summary Judgment Order that two of those sources—emails from individuals in Maryland and Illinois—could not be reasonably relied on as proof that Defendants injured kids' arms. [DN 78 at 907.] Defendants thus argue that leaves Dr. House's testimony that "the Delabar kid, your secretary's son, and Stick, the great big

kid with the great arm" "were either having elbow" or "a shoulder issue." [DE 98, citing House Dep. at 184:21-24]. Defendants argue Dr. House failed to identify these individuals with specificity or place any timestamps on those alleged injuries. Defendants argue any testimony by Dr. House about these injuries is: (1) impermissible lay testimony that can only be made by an expert, (2) speculative and without personal knowledge, and (3) hearsay without exception under Fed. R. Evid. 801. [DE 98].

Plaintiffs respond that this is not a workers' compensation proceeding, medical malpractice case, or personal injury case in which medical expert testimony is necessary to prove the causation element of the Plaintiffs' truth defense to the Defendants' defamation claim. [DE 123]. Plaintiffs argue they do not have to prove the truth of a statement through expert testimony. Plaintiffs assert the October 2015 email on which Defendants' defamation claims are based does not purport to state with medical certainty that specific customers of Defendants suffered injuries as a direct result of Defendants' deviations from the PAJTT Program's protocols, or that these customers would not have been injured but for Defendants' deviations.

As for the Court's summary judgment ruling, Plaintiffs state the Court recognized that the statement in the October 2015 email juxtaposed two facts: (i) that certain of Defendants' customers were injured; and (ii) Defendants deviated from the protocols of the PAJTT Program. Plaintiffs assert a jury could find that both statements are true without the need for any medical expert opinion on causation. And if a jury finds both facts to be true, Plaintiffs assert then it could also find that the injuries were the possible result of deviations from the PAJTT Program's protocols by Defendants. Thus Plaintiffs argue that a jury "could find in Plaintiffs' favor if they believe that the 'customers' referred to in the October 2015 email were the 'elite guys' mentioned by Dr. House in his deposition testimony." [DE 123, citing DE 78 at 908.]  Plaintiffs state that Dr. House has

firsthand, personal knowledge of customers of Defendants who were injured. Plaintiffs state Dr. House learned about these facts through conversations with Defendants, as well as through speaking with the customers and doing "hands-on" training with them. [DE 123, citing House Dep. at 184:12 – 185:16; 191:23 – 192:4; 196:25 – 197:3]. Plaintiffs argue that Defendants have taken Dr. House's statement out of context.

B. *Analysis*

Under Fed. R. Evid. 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703." The "threshold for admitting testimony under Rule 602 is low." *United States v. Kelsor*, 665 F.3d 684, 697 (6th Cir. 2011). Further, Fed. R. Evid. 701 permits lay witness testimony so long as it is rationally based on the witness' perceptions, helpful to the trier of fact, and not based in specialized knowledge requiring expertise. "If juries are good at accurately evaluating credibility, even when personal knowledge is in substantial doubt, testimony should be permitted because its probative value will almost always outweigh the danger that the jury will be misled. When there is little danger the jury will be misled, it is logical to exclude testimony only when it is utterly without value." § 6022 Policy, 27 Fed. Prac. & Proc. Evid. § 6022 (2d ed.) (internal citations omitted). "In practice, testimony will rarely fail the [Rule 602] standard and will be more frequently excluded under a Rule 701 or Rule 802 analysis." *Id*.

Under Fed. R. Evid. 701: "Testimony [from a lay witness] in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701 thus

permits lay witness testimony so long as it is rationally based on the witness' perceptions, helpful to the trier of fact, and not based in specialized knowledge requiring expertise.

Under Fed. R. Evid. 803(c) "hearsay" means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Under Fed. R. Evid. 801(d)(2), an opposing party's statement is not hearsay so long as it: (A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

The elements of defamation are: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Toler v. Süd-Chemie, Inc*., 458 S.W.3d 276, 282 (Ky. 2014).

The Defendants' argument that the Plaintiffs would have to prove customers were hurt with a medical expert is unsupported and the Court agrees with the Plaintiffs that expert testimony is not required. An element of defamation is whether there is "fault amounting at least to negligence on the part of the publisher." *Toler*, 458 S.W.3d at 282. The testimony from Dr. House is relevant to whether NPA exercised ordinary care in making the statement at issue. In addition, Dr. House's testimony is based on the work that he did while training these individuals and his conversations with the Defendants, which are statements by party-opponents and not hearsay. Assuming this foundation is laid at trial, the testimony is supported with personal knowledge and is not hearsay.

14

The Defendants' Motion in Limine to Prevent Unsupported Allegations of Injuries [DE 98] is **DENIED**.

### C. **Plaintiffs' Motion in Limine to Exclude Certain Testimony of Newton Defendants relating to Alleged Copying of Velocity Plus Program** [DE 107].

#### 1. *Background*

Defendants Joe Newton and his son, Joseph J. Newton, appear on Defendants' witness list. Joe Newton "will testify about the nature of his business, Players' Dugout, his interactions with other parties in the litigation, and the PAJTT Program." [DE 102]. Joseph J. Newton "will testify about the nature of his business, Players' Dugout, his interactions with other parties in the litigation, and the PAJTT Program." [DE 102].

Plaintiffs seek to exclude testimony by the Newton Defendants that unauthorized third parties were copying or pirating the Velocity Plus Program. [DE 107]. Plaintiffs argue the Newtons deposition testimony established that they had no personal knowledge of unauthorized pirating because their information reflected only what others told them or what appeared on third-party websites, and thus, any testimony would be inadmissible hearsay. [DE 107, DE 107-1, DE 107-2]. Defendants respond that "the rules of evidence permit Joe Newton to offer into evidence what he was told and what he conveyed because he is a party to both circumstances." [DE 119]. Defendants also argue that the testimony is not hearsay because it is not offered for the truth of the matter asserted. Instead, the testimony Plaintiffs seek to exclude would be offered to show that Dr. House was on notice about potential pirating, had a duty to investigate, and failed to do so. [DE 119].

#### 2. *Analysis*

The requirements for personal knowledge, proper lay opinion, and hearsay are set forth above and are incorporated here.

The Newtons have the requisite personal knowledge under Fed. R. Evid. 602 to testify about what they were told, what they conveyed, and what they saw on third-parties' websites. The issue is whether their testimony would be inadmissible hearsay under Fed. R. Evid. 802. The Court agrees with the Defendants that the Newtons' testimony that unauthorized third parties were copying or pirating the Velocity Plus Program is not hearsay. The Defendants have a counterclaim against Plaintiffs for breach of contract. They claim that Plaintiffs breached the parties' agreement by (1) failing to investigate and stop "known or suspected attempts by third parties to sell or market the PAJTT Program who do not have a contractual arrangement with [Defendants] . . ." "knowingly permit[ing] unauthorized third parties to sell and market the PAJTT Program . . ." and not making "meaningful effort to stop or otherwise prevent such piracy." [DE 119; DE 39-1 at 257].   The testimony of the Newtons on alleged instances of pirating are not offered to prove the pirating was taking place, but that Plaintiffs learned of these claims from Defendants. The "point of the Newtons' testimony [is] . . . they told Dr. House that they had seen and heard that Players' Dugout's exclusivity in the PAJTT was in jeopardy, and Dr. House responded by doing nothing whatsoever to comply with the License Agreement." [DE 119].   Thus, the Plaintiffs' Motion in Limine to Exclude Certain Testimony of Newton Defendants relating to Alleged Copying of Velocity Plus Program [DE 107] is **DENIED**.

**D.  Plaintiffs' Motion in Limine for Ruling on Objections Asserted in Deposition of William ("Bill") Schopp [DE 108].**

*1.  Background*

Schopp is on Defendants' witness list and expected to testify, by deposition transcript, "to his work with the Newtons and Players' Dugout as a coach, his interactions with Dr. House, and the PAJTT Program." [DE 102 at 1133]. Plaintiffs object to two answers that Schopp gave in his deposition. [DE 108]. The first objection relates to this exchange:

> Q: Do you know how many–do you have an idea of how many of those NPA certified coaches there were back in 2014, 2015, 2016?
>
> Mr. Holbrook: Objection
>
> THE WITNESS: I think they lost count. I mean, that was before they kind of reorganized. But at that particular time, it was numerous amounts. Probably thousands around the country.

[DE 100, Schopp Dep. 6:23-25, 7:1-6]. The answer involved the number of NPA certified coaches that existed in certain years. Plaintiffs argue the question was speculative and lacked proper foundation. [DE 108]. Plaintiffs argue Schopp lacked personal knowledge and no foundation was laid to show how he would have known that NPA "lost count" of the number of coaches. Defendants respond that Plaintiffs objections are waived because they did not state the grounds for the objections during the deposition. [DE 120]. As this was trial testimony, Defendants assert that the objection needed to be stated with specificity to permit Schopp to clarify if needed. Defendants also argue Plaintiffs also failed to put Defendants on notice that they objected to the admissibility of these questions. Finally, Defendants argue the answer was not speculative.

Plaintiffs also object to the following answer:

> Q: And based on your opinion and experience, this statement that Joe Newton and his company, Velocity Plus, were hurting kids, that was a false statement, correct.
>
> A: Yes
>
> Mr. Holbrook: Objection.

[DE 100, Schopp Dep. 14:15-20]. Plaintiffs argue this is improper lay testimony. [DE 108].

### 2.   *Analysis*

As to the first objection, Plaintiffs have waived their objections to lack of foundation and speculation regarding the number of NPA coaches. Fed. R. Civ. P. 32 addresses the use of depositions in court proceedings. Fed. R. Civ. P. 32(b) states, "Objections to Admissibility. Subject

17

to Rules 28(b)[3] and 32(d)(3), an objection may be made at a hearing or trial to the admission of any deposition testimony that would be inadmissible if the witness were present and testifying." Fed. R. Civ. P. 32(d)(3) addresses when objections during depositions to be used in court proceedings are waived:

> (3) To the Taking of the Deposition. (A) Objection to Competence, Relevance, or Materiality. An objection to a deponent's competence—or to the competence, relevance, or materiality of testimony—is not waived by a failure to make the objection before or during the deposition, unless the ground for it might have been corrected at that time.
>
> (B) Objection to an Error or Irregularity. An objection to an error or irregularity at an oral examination is waived if:
>
> (i) it relates to the manner of taking the deposition, the form of a question or answer, the oath or affirmation, a party's conduct, or other matters that might have been corrected at that time; and
>
> (ii) it is not timely made during the deposition.

Fed. R. Civ. P. 32(d)(3).

> The Sixth Circuit explained the purpose of Rule 32(d) as follows:
>
> If the objection could have been obviated or removed if made at the time of the taking of the deposition, but was not made, then that objection is waived. The focus of the Rule is on the necessity of making the objection at a point in the proceedings where it will be of some value in curing the alleged error in the deposition.  When a party waits until trial to object to testimony in the deposition, the only manner in which to cure the deposition is to bar the objectionable portions from the trial. It is important that objections be made during the process of taking the deposition, so that the deposition retains some use at the time of trial; otherwise counsel would be encouraged to wait until trial before making any objections, with the hope that the testimony, although relevant, would be excluded altogether because of the manner in which it was elicited.

*Bahamas Agr. Indus. Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1181 (6th Cir. 1975); *see also*

*Elyria–Lorain Broad. Co. v. Lorain J. Co.*, 298 F.2d 356, 360 (6th Cir. 1961) (holding that an objection to leading question was waived because it was not made at deposition); *Jordan v.*

---

[3] Fed. R. Civ. P. 28(b) relates to depositions taken in a foreign country.

*Medley,* 711 F.2d 211, 214 (D.C. Cir. 1983) (suggesting that an objection for failure to lay an adequate foundation would be waived if not presented at deposition). Objections to that are waivable include leading questions, lack of foundation, assuming facts not in evidence, mischaracterization or misleading question, non-responsive answer, lack of personal knowledge, testimony by counsel, speculation, asked and answered, argumentative question, and witness' answers beyond the scope of the question. *Harper v. Griggs*, No. 04–260–C, 2007 WL 486726, at *1–2, *2 n. 1 (W.D. Ky. Feb.12, 2007). As Plaintiffs' objections to foundation and speculation could have been cured at the time of the deposition or relate to the form of the question or answer, they are waived under Fed. R. Civ. P. 32(d)(3)(A) and (B).

Plaintiff's second objection regarding alleged improper opinion testimony is not waived. Fed. R. Evid. 701 permits lay witness testimony so long as it is rationally based on the witness' perceptions, helpful to the trier of fact, and not based in specialized knowledge requiring expertise. As stated above, the Court does not believe medical expert testimony is required regarding whether customers were hurt. Under Fed. R. Evid. 602, Schopp had personal experience with the Newtons and the Plaintiffs and not personally experience his pitchers being injured from the program. [DN 100-1 at1000-1001]. Schopp testified he was "confused" when he received the email from Plaintiffs that accused Defendants of possibly injuring their customers "because, personally [Schopp hasn't] had any issues with any of the programs at all with anyone." [DE 100-1 at Page ID## 1005-1006]. The Court thus finds that Schopp's testimony is appropriate under Fed. R. Evid. 602 and 701. For these reasons, Plaintiffs' motion [DE 108] is **DENIED**.

### E.  Defendants' Objection to Plaintiffs' Exhibit List for Trial [DE 117].

Defendants make five objections to Plaintiffs' exhibit list.

*1. Objection to Plaintiffs' Trial Exhibit 2 – Registration Certificate*

Defendants object to Plaintiffs' Trial Exhibit 2, the NPA Trademark Certification of Registration, Bates No. TH00468-469 "insofar as the abandoned services are irrelevant and contain no probative value to these proceedings and should therefore be redacted." [DE 117]. Defendants argue the abandoned services, "Pre-recorded DVDs and videotapes featuring baseball pitching instruction" under International Class 009 are not relevant and could create undue prejudice because "goods and services named in a trademark registration serve to create a presumption of secondary meaning for those specific goods and services, and conversely, any goods and services not so named in the registration require proof of secondary meaning." Thus, Plaintiffs argue those abandoned services (or abandoned goods) would confuse the jury into believing that the NPA registration provides more protection than it does. Plaintiffs respond that they have not alleged, and, to Plaintiffs' knowledge, Defendants have never sold "pre-recorded DVDs or videotapes," thus the registration certificate will not confuse the jury about any issue. Plaintiffs argue the Defendants can cross-examine Plaintiffs about whether the NPA Trademark registration abandoned any classifications.

There are two names in issue in Plaintiffs' trademark claims (1) the registered NPA trademark relating to Plaintiffs' claims of federal trademark infringement, federal unfair competition, and common law unfair competition under Kentucky state law; and (2) the unregistered name of Dr. House relating to Plaintiffs' claims of federal unfair competition and common law unfair competition under Kentucky state law. "The owner may rely solely on the registration certificate to prove that the owner has the right to exclude others from using the trademark in connection with products specified in or closely related to those stated in the registration." [DE 116 at 1263]. Plaintiffs have a right to use the registration certificate to prove they had the right to exclude others from using it. The Defendants will be able to cross-examine

the Plaintiffs about the abandoned goods to clarify this issue for the jury. As such, the danger of confusion does not outweigh the relevance of the registration certificate and thus Defendants' objection to the registration certificate is **OVERRULED**.

2.     *Objection to Plaintiffs' Trial Exhibit 3 – Wikipedia Page*

Defendants object to Plaintiffs' Trial Exhibit 3, the Tom House Wikipedia Page Printout, Exhibit 1 to Dep. of Tom House, because it is hearsay without an exception. [DE 117]. Plaintiffs do not identify a basis for admission of this page. [DE 126]. Under Fed. R. Evid. 201, the Court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). But Wikipedia is a source whose accuracy can be reasonably questioned. "Federal courts across the nation have continually recognized that Wikipedia's reliability is doubtful, given that by its own statement, 'Anyone with Internet access can write and make changes to Wikipedia articles.'" *Doe v. Mich. Dep't of Corr.*, No. 13-14356, 2014 WL 2207136, at *11 n.3, (E.D. Mich. May 28, 2014) (quoting About Wikipedia, http://en.wikipedia.org/wiki/Wikipedia: About (May 13, 2014, 5:54 p.m.)); *see United States v. Lawson,* 677 F.3d 629, 650-51 (4th Cir. 2012) (citing several federal cases in which use of Wikipedia was criticized). Plaintiffs thus may not rely on a Wikipedia entry in support of their claim for trademark infringement and Defendants' objection is **GRANTED**.

3. *Objection to Plaintiffs' Trial Exhibits 60 and 61 – PTAB Briefs*

Defendants object to Plaintiffs' Trial Exhibits 60 and 61, the Patent Trial and Appeal Board ("PTAB") briefs, Bates Nos. TH00096-126 and TH00068-95, on grounds that they are irrelevant and would only confuse the jury about the issues they have to decide. [DE 117]. Defendants argue that because the validity of the patent registration denial is not at issue, the PTAB briefs are

irrelevant. Plaintiffs respond that Plaintiffs' patent counsel in connection with the PAJTT Program patent application may be called to testify "to the status of Dr. House's patent application and is offered for the purpose of contesting Defendants' counterclaims." [DE 136]. Plaintiffs assert this evidence is relevant to Defendants allegation that they were unaware that the PAJTT Program never received patent protection and that they did not learn of the patent application until late 2014. [DE 78.]

The evidence is relevant as it relates to the dispute about when Defendants were on notice there was no patent. The relevance of the evidence is not outweighed by any risk of confusion. Thus the objections to the TPAB briefs or answer is **OVERRULED**.

4. *Objection to Plaintiffs' Trial Exhibits Containing Third-Parties' Emails*

Defendants object to any of Plaintiffs' exhibits containing emails in which out of court third parties conveyed information of any kind to the witnesses present at trial. Defendants point to Plaintiffs' exhibit list [DN 109] that they assert contains hundreds of emails that contain hearsay. The Court does not have enough information to grant this type of broad objection and it would not be appropriate to do so. Objections to the admissibly of these exhibits will be addressed during trial. The objection is **OVERRULED** at this time.

## F. <u>Defendants' Objection to Plaintiffs' Identified Remote Witnesses</u> [DE 118].

### 1. Background

Plaintiffs' witness list identifies four witnesses—Mike Fetko, Corey Ishigo, Gardner O'Flynn, and Dean Doxakis—who will testify at trial "Via Zoom or other Videoconference protocol, with Court approval." [DE 105 at 1148-1149]. Plaintiffs' witness list includes four other witnesses—Randy Wishmyer, Steve Nelson, Desmond O'Sullivan, and Jordan Osegura—who may also testify at trial "Via Zoom or other Videoconference protocol, with Court approval." *Id.*

These witnesses to reside in Alaska, California, Hawaii, Utah, Texas, and Massachusetts. *Id.* But, since the pretrial conference, Plaintiffs have agreed that Doxakis, Wishmyer, Nelson, O'Sullivan, and Osegura will testify in person if they are called as witnesses. [DE 125]. Thus, this objection is now limited to Fetko (Anchorage, AL), Ishigo (Kailua, HI), and O'Flynn (Ipswich, MA).

Defendants object to these witnesses testifying via Zoom and argue they should have the right to cross-examine in person, that cross-examining by Zoom will present challenges with exhibits, and that they will be prejudiced. [DE 118]. Defendants also object because the Plaintiffs failed to identify and depose these witnesses at trial depositions during 60-day period the Court allowed to reopen discovery. The parties jointly moved the Court to reopen discovery stating:

> The parties are working on a schedule to take the trial depositions of witnesses who are unable to be subpoenaed to testify in person at the jury trial to be held in this Court. Accordingly, the parties request that the Court grant them thirty (30) days to submit said schedule for the Court's review and approval.

[DE 90]. The Court granted the parties' request:

> Before the Court is the Parties' Joint Motion and Status Report to Conduct Trial Depositions of Witnesses Who Are Unable to Be Subpoenaed at Trial. (DN 90.) The Parties indicated that they were working on a schedule to take the trial depositions of certain witnesses and requested that the Court grant them thirty days to submit that schedule for the Court's approval. (*Id.*) The Court finds the submission of the schedule of trial depositions unnecessary. Therefore, it will deny the Parties' motion and instead grant them sixty days to complete any trial depositions as set forth below. The Court will also set this matter for pretrial conference and jury

[DE 91].

At the pretrial conference, the Court ordered the parties to attempt to resolve this issue. The Court suggested at the pretrial conference that remote testimony may be appropriate in the current COVID-19 environment depending on the length of testimony, importance of the witness to the party's case, number of exhibits to be introduced through the witness, and hardship to the witness of in-person testimony. The parties filed a report detailing their discussions. [DE 125]. The

Plaintiffs agree to have five of the eight witnesses testify in person, but still assert the remaining

three should testify via Zoom. [DE 126]. The Defendants filed a supplemental objection. [DE 127].

Plaintiffs offer Fetko, Ishigo, and O'Flynn "to rebut Defendants' allegations that third

parties who had not entered into a distributorship agreement with PDI, including the remote

witnesses, were 'pirating' the PAJTT Program (marketed and sold by Defendants as the Velocity

Plus Arm Care program), with the knowledge and consent of Dr. House." [DE 125]. Plaintiffs

estimate that the testimony of these three witnesses will take 30 minutes or less.

Plaintiffs state Fetko's testimony

will in part be foundational. Specifically, the is the custodian of Plaintiffs' Exhibit
No. 69, a video recorded by Mr. Fetko of a meeting with various NPA certified
coaches. The only other exhibit which may be used during Mr. Fetko's examination
is the Velocity Plus distributorship agreement between Defendants, Mike Fetko,
and his baseball academy, Players' Edge Sports Academy (included in Plaintiffs'
Exhibit No. 78). This document would only be used to show that Mr. Fetko entered
into a distributorship agreement with Defendants, and he will not be asked about
the document in detail. Further, Mr. Fetko lives and works in Anchorage, Alaska.
Travel time from Anchorage to Louisville, Kentucky takes a full day, meaning that
Mr. Fetko would be required to travel for approximately two full days for less than
30 minutes of testimony.

[DE 125].

Plaintiffs state Ishigo's testimony

will also be brief, and Plaintiffs' counsel anticipates his examination will be the
shortest of the remote witnesses. Further, Plaintiffs' counsel does not anticipate the
use of any exhibits in connection with his examination. Mr. Ishigo lives in Kailua,
Hawaii, and is the head coach of the Kailua High School baseball team. As a
practical matter, a trip from Kailua, HI to Louisville, KY and back involves two
full travel days. Additionally, since he works with students in the public school
system, Mr. Ishigo believes that he may have to quarantine for a period following
his return from travel to another state. Plaintiffs respectfully submit that this would
place an undue burden on Mr. Ishigo in light of the brief period of his expected
testimony.

[DE 125].

As for O'Flynn's testimony, Plaintiffs state:

24

Plaintiffs anticipate that only one or two documentary exhibits will be used during Mr. O'Flynn's examination, including: (i) Plaintiffs' Exhibit No. 21, a 9-page Velocity Plus distributorship agreement between Defendants, Mr. O'Flynn, and his baseball academy, the Pitching Fix; and (ii) Plaintiffs' Exhibit No. 50, a short email sent by Mr. O'Flynn to Marie House on November 9, 2016 in which he explained that he never implemented the PAJTT Program. Further, Counsel for Plaintiff contacted Mr. O'Flynn regarding traveling from Massachusetts to testify in person. Mr. O'Flynn indicated that doing so would cause him and his students substantial hardship. He is a public school teacher and a coach in Ipswich, MA, and it would be difficult for him to miss multiple days of school and practice to travel to Kentucky. Since he works with students in the public school system, he believes he would be required to quarantine for a period following his return from travel to another state, forcing him to take even more time off from teaching and coaching.

[DE 125]. Defendants continue to oppose the remote testimony of these three witnesses because Plaintiffs have had five years to secure their attendance or a Rule 32 trial deposition even after the Court reopened discovery at the Plaintiffs' request to allow trial depositions for just this purpose. [DE 127].  Further, Defendants assert they will be prejudiced by their inability to communicate with these witnesses on cross-examination in person, using documents and other tools of cross-examination for the jury scrutinize in person. *Id.*

Plaintiffs will call Fetko in part to provide foundational testimony for a video exhibit. Defendants agree to stipulate to the foundational aspect of Fetko's testimony on this video exhibit, thus removing the need for this aspect of Fetko's testimony, as long as Plaintiffs provide a foundational declaration that provides sufficient detail of the recording of the video. [DE 127].

### 2. *Analysis*

Fed. R. Civ. P. 43(a) provides "[a]t trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." Rule 43(a)'s advisory committee notes to the 1996

amendment states, "[t]he opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition." Although Rule 43(a) allows "testimony in open court by contemporaneous transmission from a different location," the party requesting remote testimony must present "good cause in compelling circumstances and with appropriate safeguards[,]" which "isn't applied willy-nilly." *Ballestreros v. Wal-Mart Stores E.*, LP, Case No. 2:19-cv-881-SPC-NPM, 2021 WL 2917553, at *1 (M.D. Fla. July 12, 2021). But the "'near-instantaneous transmission of video testimony through current technology permits 'the jury [or, in a bench trial, the Court] to see the live witness along with his hesitation, his doubts, his variations of language, his confidence or precipitancy, [and] his calmness or consideration[.]'" *Gould Elecs. Inc. v. Livingston Cty. Rd. Comm'n,* 470 F. Supp. 3d 735, 739 (E.D. Mich. 2020) citing *In re RFC & ResCap Liquidating Trust Action*, 444 F.Supp. 3d 967, 970, (D. Minn. Mar. 13, 2020) (quoting *In re Vioxx Prods. Litig.*, 439 F. Supp. 2d 640, 644 (E.D. La. 2006)); *see also Aoki v. Gilbert, No.* 2:11-cv-02797, 2019 WL 1243719, at *1 (E.D. Cal. Mar. 18, 2019) ("Because a witness testifying by video is observed directly with little, if any delay in transmission . . . courts have found that video testimony can sufficiently enable cross-examination and credibility determinations, as well as preserve the overall integrity of the proceedings." (internal marks omitted)). Thus Rule 43(a)'s goals can be met through video testimony and allow for appropriate safeguards.

Courts have also held the COVID-19 pandemic has presented a compelling impact on witnesses' ability to appear in-person justifying appearing by video under Rule 43. *In re RFC,* 444 F. Supp. 3d at 970 ("COVID-19's unexpected nature, rapid spread, and potential risk" established good cause under Rule 43(a) for allowing two out-of-state expert witnesses to testify remotely after expressing concerns regarding trave to the court). Courts have held the distant location of witnesses and the challenges of travel during the global COVID-19 pandemic combined to present

good cause in compelling circumstances for remote testimony. *See Castillo Frias v. Martinez*, No. 19CV2792RPKPK, 2021 WL 2661093, at *1 (E.D.N.Y. June 28, 2021) citing *Eller v. Trans Union, LLC*, 739 F.3d 467, 478 (10th Cir. 2013) (collecting cases where courts let witnesses testify remotely when "far from the site of [a] trial"); *Argonaut Ins. Co. v. Manetta Enters., Inc*., No. 19-CV-00482, 2020 WL 3104033, at *1–*2 (E.D.N.Y. June 11, 2020) (finding the current pandemic good cause in compelling circumstance for remote bench trial). Some courts have even held fully virtual civil jury trials during the pandemic. *See Le v. Reverend Dr. Martin Luther King, Jr. County*, Civ. A. No. 18-0055, 2021 WL 859493, at *2 (W.D. Wash. Mar. 8, 2021) ("Videoconference platforms like ZoomGov adequately allow for cross-examination and the near instantaneous transmission of testimony with no discernable difference from live testimony allows jurors to judge credibility unimpeded . . . Having presided over two virtual trials in which the jurors deliberated to a verdict, the Court is persuaded that defendants' concerns regarding remote proceedings are unwarranted."); *Kieffaber v. Ethicon, Inc*., No. CV 20-1177-KHV, 2021 WL 425822, at *5 (D. Kan. Feb. 8, 2021).

The Court understands Defendants' frustration that these witnesses were not identified as part of the witnesses the parties deposed by trial deposition. And Plaintiffs' counsel's assumption that this Court would permit Plaintiffs to bring eight witnesses remotely was misguided at best. But the Defendants have not represented that they would have taken those trial depositions in-person in Alaska, Hawaii, or Massachusetts. Thus, that error has not caused significant prejudice to the Defendants, because taking a trial deposition remotely will be much like examining these witnesses remotely at trial by video in terms of technology and use of exhibits. It will also be better for the jury to experience these three witnesses' testimony live, even if by video, than by pre-recorded trial deposition. Defendants will be allowed to cross-examine these witnesses, and

videoconferencing technology will allow for near-instantaneous transmission of these witnesses

testimony.[4] Given the distance of these witnesses, the short nature of their expected testimony (less

than an hour) with minimal exhibits, the continuing nature of the COVID-19 pandemic, and the

burden appearing at trial would place on them, the Court will allow these three witnesses—Ishigo,

Fetko, and O'Flynn—to testify remotely at trial by video and Defendants' objection [DE 118] and

supplemental objection [DE 127] as to these witnesses is **OVERRULED.** Defendants' objection

to the remaining five witnesses originally proposed to be remote is **DENIED AS MOOT** because

they will testify at in-person at trial if called.

### G. <u>Defendants' Response to Plaintiffs' Designation of Schopp and Sheehan Testimony that the Court construes as an Objection</u> **[DE 121].**

Defendants objected to the Plaintiffs' deposition designations for Mark Sheehan, who

worked with the Newtons and Player's Dugout as a coach and interacted with Dr. House and the

PAJTT program, and Bill Schopp, who also worked with the Newtons and Players' Dugout as a

coach, and interacted with Dr. House and the PAJTT program   [DE 121]. Plaintiffs did not file a

response or objection to these request and objections.

#### 1. *Objections to Sheehan Designations*

As to the deposition of Mark Sheehan, Defendants argue the entire page 22 into 23:2 should

be read into the record to ensure that the full opinion of Mr. Sheehan related to the letter that he is

reading in the testimony is fully disclosed to the jury. The Court **GRANTS** this request.

Defendants argue Mr. Sheehan's testimony at 27:1-28:2 should be read as a whole so the

jury hears the full articulation of any criticism Mr. Sheehan had of Defendants, if any. As

---

[4] The Court has allowed other trial witnesses, in limited instances during the COVID-19 pandemic, to testify remotely by video at trial without issue.

designated, Defendants argue portions of Mr. Sheehan's explanation are omitted. The Court **GRANTS** this request.

Defendants argue the Plaintiffs designated two lines from page 30 of Mr. Sheehan's testimony, but they have no context. Defendants argue the jury should know what Mr. Sheehan knows about Alex Marney, in which case this designation should be supplemented with 29:22-30:11. The Court **GRANTS** this request.

Defendants argue that Plaintiffs' designation of page 34 should be supplemented to include 34:7-35:8. The Court **GRANTS** this request.

Defendants argue Page 38 contains a spat between Plaintiffs' counsel, Mr. Sheehan, and Mr. Sheehan's counsel that need not be read to the jury, as it contains no probative value. The Court **GRANTS** this objection and the irrelevant conversation between counsel should be removed.

Defendants argue the testimony at 50:11-18 is irrelevant because it discusses conversations about the PAJTT patent between Plaintiff House and Mr. Sheehan. Mr. Sheehan is not a party to the contract at issue, argues Defendants, and what he knew or did not know about a patent is irrelevant to the representation and warranty House made to Players' Dugout on the patent. The Court **OVERRULES** this request because the testimony is relevant to Plaintiffs' defense on Defendants' breach of contract counterclaim.

Finally, Defendants argue Mr. Sheehan testifies in response to a question about what he told Marie House that he did not remember, so Plaintiffs should not read the question to which he does not remember the answer to the jury (71:16-72:24). Defendants argue Mr. Sheehan he speculates in that testimony about what he might have said based on what Plaintiff House told him. The Court reviewed this testimony. [DE 100 at 1114-15]. Counsel asked Mr. Sheehan a leading

question.   Leading questions may be appropriate under Rule 611 if Mr. Sheehan was a hostile or adverse witness. Based on the testimony before this questioning it seems Mr. Sheehan is an adverse witness. The objection is **OVERRULED**.

### 2. *Objections to Schopp Designations*

As to the deposition of Schopp, the Defendants argue the entire page 21 should be read into the record to ensure that the jury is not falsely led to believe "Defendants coopted testimony from Schopp because of their relationship." The objection/request is **GRANTED**.

Defendants argue Plaintiffs' designation of testimony from Page 26 ignores Defense counsel's objection and Plaintiffs' counsel's admission that he misrepresented the evidence in the question posed. Thus, the question asked at 26:4-7 should be stricken. The Court reviewed this testimony and the objection/request is **GRANTED** and the question at 26:4-7 should be removed.

Defendants argue the testimony at 28:1-7 should be read into the record to provide more clarity and context about the agreement that Defendants have designated testimony about on page 27 and the balance of 28. The request is **GRANTED**.

Defendants argue Plaintiffs end their designated testimony at 33:16 with a question and omit Mr. Schopp's answer. Defendants argue his answer should be part of the record to ensure completeness. But Defendants note an objection was made because the question posed at 16 and then at 33:20-22 misstates the record and must be ruled on by the Court before it is entered into the record. The Court reviewed the testimony and this objection/request is **OVERRULED**.

### IV.  CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1. The Motion in Limine to Prevent Testimony Regarding Plaintiff House's Work with Professional Athletes [DE 97] is **DENIED**;

2. The Motion in Limine to Prevent Unsupported Allegations of Injuries [DE 98] is **DENIED**;

3. The Motion in Limine to Exclude Certain Testimony of Newton Defendants relating to Alleged Copying of Velocity Plus Program [DE 107] is **DENIED**;

4. The Motion in Limine for Ruling on Objections Asserted in Deposition of Bill Schopp [DE 108] is **DENIED**;

5. Defendants' Objection to Plaintiffs' Exhibit List for Trial [DE 117] is **GRANTED in part** and **DENIED in part** as set forth above;

6. Defendants' Objection to Plaintiffs' Identified Remote Witnesses [DE 118] and Supplemental Objection [DE 127] is **DENIED**;

7. Defendants' Response to Plaintiffs' Designation of Schopp and Sheehan Testimony that the Court construes as an Objection [DE 121] is **GRANTED in part** and **DENIED in part** as set forth above.

Rebecca Grady Jennings, District Judge
United States District Court

October 20, 2021

31