UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DR. THOMAS HOUSE, ET AL.                                    Plaintiffs/Counterclaim Defendants

v.                                                                      Civil Action No. 3:16-cv-00594-RGJ

PLAYERS' DUGOUT, INC., ET AL.                            Defendants/Counterclaim Plaintiffs

* * * * *

**MEMORANDUM OPINION AND ORDER**

Defendants and Counterclaim Plaintiffs Joseph A. Newton ("Joe Newton"), Joseph John Newton ("Joseph Newton") (collectively, the "Newtons"), and Players' Dugout, Inc. ("PDI") (collectively, "Defendants") move for renewed judgment as a matter of law or for a new trial under Fed. R. Civ. P. 50(b) and 59(a). [DE 170]. Plaintiffs and Counterclaim Defendants Dr. Thomas House ("Dr. House") and the National Pitching Association, Inc. ("NPA") (collectively, "Plaintiffs") responded [DE 179], and Defendants replied. [DE 181]. All parties moved for attorney fees. [DE 171; DE 172]. The parties then filed responses [DE 178; DE 177], and replies [DE 180; DE 182]. These matters are ripe. For the reasons below, the Court **DENIES** Defendants' motion for renewed judgment as a matter of law or for new trial [DE 170], **GRANTS in part** Defendants' motion for attorney fees [DE 171], and **GRANTS** Plaintiffs' motion for attorney fees [DE 172].

## I.        BACKGROUND

The background is set forth in the Court's previous order on the parties' motions in limine [DE 128] and is incorporated by reference.

The Court held an eight day jury trial November 15, 2021 through November 24, 2021. [DE 164 at 2956]. The jury found for Dr. House and against PDI on the parties' breach of contract

1

claims and awarded $40,386.20 in damages to Dr. House.  [*Id.* at 2956-57].  The jury also found

for Plaintiffs on their federal trademark and unfair competition claims ("Lanham Act claims") and

awarded damages.  [*Id.* at 2957].  The jury awarded $1 actual damages and $340,000 in lost profits

damages.  [*Id.*].  The jury similarly found for Plaintiffs on the Kentucky law claims of unfair

competition, awarding compensatory damages of $1 and punitive damages of $67,649.82.  [*Id.*].

The jury found for NPA on Defendants' defamation per se counterclaim, against NPA on

Defendants' defamation *per quod* counterclaim, and awarded $100,000 in compensatory damages

to Defendants.  [*Id.* at 2958].  The jury found for Defendants on their counterclaim of unfair

competition under federal law and awarded $25,000 in compensatory damages.  [*Id.*].  The jury

found for Defendants against NPA on the claim of tortious interference with prospective business

advantage and awarded $50,000 in compensatory damages and $25,000 in punitive damages.  [*Id.*].

## II.      DISCUSSION

### A. Defendants' Renewed Motion for Judgment as a Matter of Law or for New Trial [DE 170].

The Court denied each party's motion for judgment as a matter of law at trial.  [DE 162 at

2825-34, 2858-63].  Defendants now move for renewed judgment as a matter of law or for new

trial.  [DE 170].

#### I.   Standard

If a court does not grant judgment as a matter of law after close of evidence and the party

renews its request after a verdict is entered, the court may (1) allow the judgment to stand, (2)

order a new trial, or (3) direct entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b).  Judgment

as a matter of law may be granted when "a party has been fully heard on an issue and there is no

legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."

*Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (citations omitted).  In

2

considering such a motion, the district court must view "the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences." *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012) (quotation marks and citations omitted). The Court may not "reweigh the evidence, question the credibility of witnesses, or substitute [its] own judgment for that of the jury." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 306 (6th Cir. 2016). Then, the question must be asked if "there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Balsley*, 691 F.3d at 757. If so, the court should grant the motion.

Under Federal Rule of Civil Procedure 59(a) ("Rule 59(a)"), a trial court may grant a new trial on "all or some of the issues" following a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(B). The Sixth Circuit has interpreted Rule 59(a) to require a "seriously erroneous result," as evidenced by one of three things: "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045–46 (6th Cir. 1996) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Cygnar v. City of Chicago*, 865 F.2d 827, 835 (7th Cir. 1989); and *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 691 (2d Cir. 1983)). When a new-trial motion challenges the weight of the evidence, the Court must "accept the jury's verdict 'if it is one which reasonably could have been reached.'" *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) (quoting *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)). "[T]he grant or denial of a new trial is purely within the discretion of the trial court and will not be reversed except upon a showing abuse of discretion." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989). The Court cannot set aside the jury's

verdict simply because it thinks another result is more justified.  *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 534 (6th Cir. 2014).

a.   <u>Plaintiffs' Introduction of Lost Profits Evidence.  [DE 170-1 at 3200-07].</u>

Defendants request judgment as a matter of law or a new trial on Plaintiffs' trademark infringement and unfair competition damages.  [DE 170-1 at 3207].  Defendants argue "it was an abuse of discretion to admit evidence of Plaintiffs' trademark infringement and unfair competition damages at trial, which had not been previously disclosed in discovery as required."  [*Id.*].  Defendants alternatively request "full supplementation by Plaintiff. . . follow up discovery. . . [and a new] trial" on the issue.  [*Id.*].  Defendants' argument rests on an analysis of Federal Rule of Civil Procedure 26 ("Rule 26").

Rule 26 requires a party to provide the opposing party "a computation of each category of damages claimed" as well as "the documents or other evidentiary material on which each computation is based, including materials bearing on the nature and extent of injuries suffered." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 366–67 (6th Cir. 2010) (quoting Fed. R. Civ. P. 26(a)(1)(A)(iii)).  Courts have explained that the "documentation and evidence required by Rule 26 must be sufficient to allow the opposing party to 'independently analyze' the claim." *Champion Foodservice, LLC v. Vista Food Exch., Inc.*, No. 1:13-CV-1195, 2016 WL 4468000, at *5 (N.D. Ohio Aug. 23, 2016) (citing *Bessemer*, 596 F.3d at 370). Rule 26(e) places an ongoing duty on parties to supplement disclosures.  Fed. R. Civ. P. 26(e).  Should a party fail to provide information required under Rule 26(a) or (e), the party is not allowed to use that information at trial unless the failure was substantially justified or is harmless.  Fed. R. Civ. P. 37(c).

To determine whether a failure disclose is substantially justified or harmless, the Court looks to five factors set forth in *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). The five factors are (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.  "[J]udges need not apply *Howe's* factors rigidly."  *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 220 (6th Cir. 2019) (finding omission of one *Howe* factor was not fatal to lower court's analysis).

Courts have explained that Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a); that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Hunt v. Hadden*, 127 F. Supp. 3d 780, 789 (E.D. Mich. 2015), *aff'd*, 665 F. App'x 435 (6th Cir. 2016) (quoting *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)). The burden is on the potentially sanctioned party to prove harmlessness.  *Id.* (citing *Roberts ex rel. Johnson*, 325 F.3d at 782).  In other words, the test for exclusion of evidence as a discovery sanction is very simple: "the sanction is mandatory unless there is a reasonable explanation of why the duty to disclose or supplement was not complied with or the mistake was harmless." *Bessemer*, 596 F.3d at 370.  Thus, as Plaintiffs sought lost profits damages but did not disclose a calculation for such damages, they have the burden of demonstrating that their failure was substantially justified or harmless.

Defendants argue that Plaintiffs violated both Rule 26(a) and (e).  [DE 170-1 at 3201-03]. Defendants argue that "Plaintiffs did not 'provide . . . a computation of each category of damages claimed' in their Rule 26(a) initial disclosures" when they "estimated compensatory damages to

be in excess of $1,000,000" and reserved the right to rely on expert testimony, but only computed damages at trial.  [*Id.* at 3201].  Defendants also argue "at no time prior to trial did [Plaintiffs] every [sic] provide any such expert disclosure or supplementation of this superficial disclosure." [*Id.*].  Plaintiffs in response argue that their nondisclosure "was the consequence of [Defendants] own obstinate behavior"—their failure to produce the documents Plaintiffs requested in discovery. [DE 179 at 3488].

The Court first considers whether Defendants were surprised.  Defendants knew the category of damages sought, lost profits damages, Plaintiffs informed Defendants they needed additional documentation to calculate these damages, and Defendants possessed the documents Plaintiffs used at trial to calculate damages—their own royalty reports.  [DE 170-1 at 3204; 161 at 2612, 2615-20].   Lost profits damages, in this context and as requested by Plaintiffs, were Defendants' revenues, as calculated from their royalty reports, from their infringing use of Plaintiffs' trademarked program—information only Defendants could have possessed.  [*See* DE 161 at 2548-56; 179 at 3488]; *see also G & J Gears Australia Pty. Ltd. v. Rockcrusher USA LLC.*, No. 4:06 CV 2314, 2009 WL 10688912, at *3 (N.D. Ohio Feb. 13, 2009) (in a Lanham Act case, the plaintiff's "calculation of damages is dependent on defendants' disclosures from their tax returns and accounting documents produced by defendants themselves.").  So Defendants cannot be particularly surprised by the documents or the fact that Plaintiffs presented evidence of lost profit damages.  *See Akron*, 801 F.3d at 748 (late disclosure not a surprise when defendant had all relevant information in its possession).  Nor were Defendants surprised—they acknowledged at trial that Plaintiffs had been "going after royalties."  [DE 161 at 2552-56].

Defendants argue "Plaintiffs provided nothing – not a single itemization of damages until Marie House took the stand at trial and even that was a surprise number which she apparently

6

calculated during trial, not a calculation that had been seasonably disclosed pretrial." [DE 170-1 at 3204].  While this appears to be true, Plaintiffs provide correspondence they sent Defendants a few months before trial, requesting Defendants supplement discovery with financial documents, including Defendants' revenues and losses for the years Defendants used Plaintiffs' trademarks. [DE 179-1 at 3513-15].  Plaintiffs stated in their correspondence that the "documents requested hereby are relevant and necessary to the calculation" of Plaintiffs' "damages. . . [which] cannot be fully ascertained without" the requested supplemental discovery.[1]  [*Id.* at 3513-14].  Having informed Defendants before trial they could not calculate the full damages without more documents, and having received no additional documentation, Plaintiffs calculated a damages figure at trial using the provided documents and basic math in the form of addition and multiplication.  [DE 179 at 3491; DE 161 at 2619].  Plaintiffs emailed this calculation to Defendants the night before Marie House's testimony regarding damages, during which she testified that she used those documents to arrive at her calculation.  [DE 161 at 2619; DE 179-2 at 3517-19].  Basic math as a form of calculating damages should not reasonably have surprised Defendants.  Thus, nothing involved in calculating damages—the presentation of damages, Defendants' documents, or the method of calculation—should have particularly surprised Defendants. *See Malee v. Anthony & Frank Ditomaso, Inc.*, No. 1:16CV490, 2018 WL 2938970, at *4 (N.D. Ohio May 2, 2018) (no surprise to defendants when expert's supporting materials were

---

[1] Defendants also argue that Plaintiffs "never requested profits information in discovery" [DE 170-1 at 3206] and if Defendants had "not provided enough information to seasonably compute [Plaintiffs'] damages . . . they should have sought an extension of the discovery deadline to request the additional information they had not previously requested."  [DE 181 at 3566].  Yet in Plaintiffs' initial disclosures, attached to Defendants' motion, Plaintiffs propounded financial requests, including: "Accounting/financial records of PDI evidencing all revenues received by PDI though sales of the Velocity Plus Program," "accounting/financial records of PDI evidencing all royalty payments withheld from Dr. House," and documents pertaining to royalty reports."  [DE 170-2 at 3225].  These requested documents clearly include profit information.

in defendants' possession and damages were "largely a mathematical computation" based on those materials).  This factor favors Plaintiffs.

Second, the Court considers whether Defendants had adequate opportunity to remedy the surprise.  Basic math, such as the addition and multiplication Plaintiffs used to calculation damages, is appropriate for lay testimony and for the calculation of profits under the Lanham Act, so no expert testimony was necessary.  *See United States v. Madison*, 226 F. App'x 535, 544 (6th Cir. 2007) (quoting a tenth circuit case discussing "mathematical calculations[s] well within the ability of anyone with a grade-school education [as] . . . more aptly characterized as a lay opinion"); 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or other deduction claimed."); *and CareDx, Inc. v. Natera, Inc.*, No. CV 19-662-CFC-CJB, 2021 WL 1840646, at *3 (D. Del. May 7, 2021) (excluding, within its discretion, expert for Lanham Act damages because his testimony went to "simple math calculations").  Yet Defendants had an expert witness at trial, Drew Chambers, who testified after Marie House to an alternative calculation of Plaintiffs' lost profit damages and could have reviewed any documents in Defendants' possession.  [DE 161 at 2679-80, 2685-2709]; *see, e.g.*, *Gregory v. Raven*, No. 2:18-CV-02793 JPM, 2020 WL 4194524, at *4 (W.D. Tenn. July 21, 2020) (defendants cannot cure surprise when they have no opportunity to procure a counter-expert).  At trial, Defendants themselves as lay witnesses also had the opportunity to remedy surprise by testifying about the calculations.  Defendants waived argument regarding opportunity to cure by not requesting such an opportunity at trial to recess to allow review of the calculations or any additional time.  Because Defendants own documents were used at trial to calculate damages of their profits and they had an expert who testified at trial about lost profit damages, Defendants

8

had opportunity to remedy surprise resulting from Plaintiffs' damages calculation. This factor favors Plaintiffs.

Third, the Court addresses whether the introduction of the evidence would disrupt the trial. Defendants argue that the introduction of the lost profit damages evidence was disruptive because it was a surprise. [DE 170-1 at 3201]. As discussed, the introduction of this evidence could not have been a real surprise to Defendants. And since Plaintiffs not only used Defendants' own documents but also had not yet rested their case, Defendants had the opportunity to cross-examine Marie House, Defendants' own expert, and any other witness they believed relevant to the question of damages. Allowing this evidence would not, for example, require taking additional depositions and re-opening discovery.[2] *See, e.g.*, *Pearce v. Hazel Park Police Officer*, No. 16-11499, 2019 WL 5586965, at *1 (E.D. Mich. Oct. 30, 2019) (allowing depositions at a late date to cure surprise would disrupt trial). Thus, this information was not overly disruptive and this factor favors Plaintiffs.

Next the Court considers the importance of the evidence. Because the evidence is crucial to Plaintiffs' calculation of lost profit damages calculation, the evidence is both important to Plaintiffs' case and prejudicial to Defendants'. *See Ford Motor Co. v. Thermoanalytics, Inc.*, No. 14-CV-13992, 2016 WL 1465015, at *4 (E.D. Mich. Apr. 14, 2016) (evidence replied upon for damages calculation regarded as "important"); *see also EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, No. 5:16-CV-150-JMH-REW, 2017 WL 2295906, at *5 (E.D. Ky. May 25, 2017), *objections overruled sub nom. EQT Prod. Co. v. Magnum Hunter Prod. Co.*, No. 5:16-CV-150-JMH, 2017

---

[2] Defendants also argue that they had never heard the damages number before Marie House's testimony and that because of the surprise of the presented damages they "could not have been prepared to cross examine." [DE 170-1 at 3207]. But Plaintiffs provide an email they sent Defendants the day before Marie House's testimony with a calculation based on PDI's partial royalties reports, so this was not day-of surprise testimony. [DE 179-2].

WL 4974782 (E.D. Ky. July 19, 2017). ("The more important the proof, the greater the effect of preclusion, but also the greater the harm in tardy disclosure."). This factor is thus neutral.

Finally, the Court considers Plaintiffs' explanation for their failure to disclose. Plaintiffs' explanation is that the documents Marie house used at trial to calculate a partial damages number were Defendants documents that Defendants possessed, and that despite Plaintiffs requests for production, Defendants never produced all the documents necessary to fully calculate damages[3] [DE 179 at 3493-96].

Rule 26 requires parties to provide:

> a copy--or a description by category and location--of all documents, electronically stored information, and tangible things that the disclosing party has **in its possession**, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment

Fed. R. Civ. P. 26 (emphasis added). Under Federal Rule of Civil Procedure 34, a party may request the opposing party to produce relevant documents "which are in the possession, custody or control of the party upon whom the request is served." Fed. R. Civ. P. 34(a)(1). But "a party may not be compelled to produce papers or things which are not in his possession, custody, or control." *Cent. States, Se. & Sw. Areas Pension Fund v. R-W Serv. Sys., Inc.*, 742 F.2d 1454 (6th Cir. 1984) (quoting 4A J. Moore, Moore's Federal Practice P34.17 (2d ed. 1983 revision)). "[I]nformation actually in the possession of the producing party or information 'easily' obtained is deemed "available."" *Bisig*, 940 F.3d at 218 n. 7 (citing *In re Sambrano*, 440 B.R. 702, 710 (Bankr. W.D. Tex. 2010)). Here, the documents were in Defendants' possession and thus available

---

[3] While the Court questions why Defendants never produced these documents in discovery and why Plaintiffs never moved to compel, the answers are irrelevant to the current analysis. Similarly irrelevant is Defendants' argument that Plaintiffs had a "duty to move to compel discovery." [DE 170-1 at 3207]. While parties may move to compel, they are under no duty to do so. *See* Fed. R. Civ. P. 37(a)(1), (3)(A) ("a party **may** move for an order compelling disclosure or discovery" (emphasis added)); *and United States v. White*, No. 03 CR 01, 2008 WL 2756333, at *6 (N.D. Ohio July 16, 2008), *aff'd,* 421 F. App'x 595 (6th Cir. 2011) ("defendants were under no duty to file a motion to compel.").

to them.  *Id.*[4]  Additionally, as borne out at trial, the damages calculation was simple math, and thus "easily obtained" and available to Defendants.  *Id.*  Because Plaintiffs were never in possession of the documents used to calculate damages at trial, they had no duty to disclose such documents, and cannot be sanctioned for their use.  *See Lasko v. Mobile Hyperbaric Centers, LLC*, No. 1:19-CV-542, 2021 WL 733768, at *5 (N.D. Ohio Feb. 25, 2021), *appeal dismissed,* No. 21-3217, 2021 WL 4057797 (6th Cir. July 9, 2021) ("[Plaintiff's] second disclosure duty and duty to produce the medical records was not triggered until she came into possession of the documents" (citing Fed. R. Civ. P. 26(a)(1)(A)(ii); and Fed. R. Civ. P. 34(a)(1))).

Defendants' other argument, that Plaintiffs disclosed their damages calculation for the first time when Marie House calculated damages on the stand, "ignores the co-dependent nature of the calculation of [Plaintiffs'] damages." *G & J Gears Australia Pty. Ltd.*, 2009 WL 10688912, at *3 (finding, on motion to compel in a Lanham Act case, the plaintiff's "calculation of damages is dependent on defendants' disclosures from their tax returns and accounting documents produced by defendants themselves.  Under these circumstances, the incomplete disclosure of damages and their computation is linked to defendants [sic] production of documents to plaintiff, so the incomplete disclosure is harmless for purposes of sanction under Rule 37(c)(1)."); *and Exec. Corp. v. Oisoon*, LLC, No. 3:16-CV-00898, 2017 WL 4310113, at *8 (M.D. Tenn. Sept. 28, 2017) (discussing, in the context of Lanham Act lost profit damages, how "[plaintiff] is prohibited, in part, from giving a more detailed calculation of its damages because it cannot obtain relevant information from [defendant]").  *See also Lucterhand v. Granite Microsystems, Inc.*, No. 05-CV-1047, 2007 WL 703400, at *17 (E.D. Wis. Mar. 2, 2007) (allowing damages evidence where

---

[4] Both parties also cite *Bessemer*, 596 F.3d at 357.  In *Bessemer*, the court disallowed a claim for lost profits because the plaintiff failed to disclose its damages calculation.  *Id.* at 367.  But in that case, the plaintiff was in possession of all of the necessary calculation materials, which it failed to disclose.  *Id.*  In contrast, here, Defendants were in possession of the documents necessary to calculate damages.

plaintiff disclosed category of damages, lost profits, and defendants were in possession of documents necessary to calculate damages "because the defendants have not demonstrated that [plaintiff's] failure to disclose a specific computation is actually harmful to them").  The final factor, explanation for nondisclosure, thus falls in favor of Plaintiffs.

The Court ruled at trial that Defendants were not harmed by Plaintiffs' failure to disclose, because they were on notice of the damages being requested and were in possession of the documents necessary to calculate these damages.   [DE 166 at 2969-76].  Four of the five *Akron* factors support such a ruling.  Thus, the Court finds that Plaintiffs' failure to disclose was harmless or substantially justified.[5]  Therefore, evidence of Plaintiffs' damages was properly admitted at trial, and Defendants' Renewed Motion for Judgment as a Matter of Law or New Trial [DE 170] is **DENIED** on Plaintiffs' introduction of trademark infringement and unfair competition damages.

b.  Weight of Lost Profits Damages Evidence [DE 170-1 at 3208-09].

Defendants move for a new trial on Plaintiffs' lost profits claim.  [DE 170-1 at 3209].  At trial, the jury awarded Plaintiffs $340,000 in lost profits damages on their Lanham Act claims. [DE 164 at 2957].  Defendants argue "the jury failed to consider evidence of the cost or deductions incurred" presented by their expert, resulting in an erroneous damages award of gross profits, rather than net profits.  [DE 170-1 at 3208-09].  They contend that, compared to Plaintiffs, "Defendants did a far better job presenting evidence that the net profit would be only a small fraction" of the amount presented by Plaintiffs.  [*Id.* at 3208].  They argue "[t]hat is the unfairness of allowing the jury to consider Plaintiffs' surprise, incomprehensible testimony."  [*Id.*].  Plaintiffs argue the jury did not ignore the weight of the evidence and that they put on the proof required by the Lanham Act.  [DE 179 at 3497-500].

---

[5] The failure to disclose only needs to be harmless or substantially justified.  On the above analysis, Plaintiffs' justification is harmless, and also likely substantially justified.

As discussed above, the Court properly allowed Plaintiffs' evidence of lost profits damages. *See* 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or other deduction claimed."). The Court allowed PDI's royalty reports and Marie House's testimony that her calculation of PDI's gross revenues during the relevant period were "337,190 or something like that" and "141,000 something."[6] [DE 161 at 2612-19]. Defendants also presented the jury with evidence of lost profit damages: an alternative calculation, presented by their expert witness, who testified to an "8.4 percent" profit margin based on PDI's tax returns.[7] [DE 170-1 at 3208; DE 161 at 2689]. The evidence presented, including Marie House's testimony on PDI's royalty reports, was sufficient to support the jury's verdict for lost profit damages, and is one that was reasonably reached. *Denhof*, 494 F.3d at 543. The Court cannot say that the verdict reached by the jury was a "'seriously erroneous result' as evidenced by[] the verdict being against the weight of the evidence." *Holmes*, 78 F.3d at 1045–46. And as reasonable jurors could and did award lost profit damages of $340,000 to Plaintiffs, the Court cannot say that "reasonable minds could have come to but one conclusion in favor of" Defendants on lost profit damages. *See Balsley*, 691 F.3d at 757. Thus, Defendants' Renewed Motion for Judgment as a Matter of Law or New Trial [DE 170] on this claim is **DENIED**.

c.   Suggestion that the Infringement is Ongoing [DE 170-1 at 3209-11].

Defendants request a new trial on Plaintiffs' infringement and unfair competition claims due to "the risk the jury may have been misled and prejudiced." [DE 170-1 at 3211]. They argue

---

[6] The first number included revenues for November 1 to July 5, 2017, and the second number included revenues for June 29, 2016 to July 5, 2017. [DE 161 at 2612-20]. Plaintiffs maintain this period is "incomplete." [DE 179 at 3491].
[7] Defendants argue that this would have resulted a "net profit number [] considerably less – in the $20,000 range." [DE 10-1 at 3208]. Absent in Defendants' brief is a citation to testimony where Defendants' expert presented the $20,000 number to the jury, nor is the Court aware of such testimony.

that on "multiple occasions, without admonition from the Court, Plaintiffs' counsel offered the contention to the effect that Defendants' ongoing liquidation of the training balls bearing the mark was wrongful, notwithstanding the agreement of counsel that Defendants were allowed to use up the existing inventory of the balls." [*Id.* at 3209]. In this referenced agreement, although not provided to the court, but merely referenced in an agreed order, the parties agreed Defendants would not use Plaintiffs trademarks "except for its liquidation of remaining **ball kits** in its possession" ("Agreement"). [DE 31 at 172 (emphasis added)]. Defendants argue that the suggestion "that infringement was ongoing . . . creates the risk of inflaming juror passion against the Defendants." [DE 170-1 at 3209]. Defendants cite Fed. R. Evid. 403, arguing that the suggested infringement was not relevant and created the risk of unfair prejudice and misleading the jury." [*Id.* at 3209-10]. Plaintiffs argue that they did not taint the jury. [DE 179 at 3500-03]. They argue that Defendants' actual "liquidation" of the balls in Defendants' logoed Throw Smart kit was continuing infringement, and not consistent with what they represented in their agreement with counsel which was liquidation of the existing "ball kits." [*Id.* at 3501-03]. They argue that Defendants liquidated the inventory by shifting it from one of their businesses to another and by placing the balls into kits with their own marks. [*Id.*]. In essence, Plaintiffs argued that liquidating "ball kits" in its possession, the agreement, was different than placing the Plaintiffs logoed balls into kits with the Defendants' logos, what they actually did. Plaintiffs contend they were entitled and allowed to investigate Defendants' use of the ball kits following the parties' agreement to liquidate. [*Id.* at 3501]. They also argue that any error was cured by the jury instructions. [*Id.* at 3502].

Plaintiffs' counsel's conduct was improper and the verdict should be set aside if "there is a reasonable probability that the verdict of [the] jury has been influenced by such conduct." *City*

*of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980) (internal quotation marks omitted); *accord Holmes*, 78 F.3d at 1045–46 ("[A] new trial is warranted when a jury has reached a seriously erroneous result as evidenced by . . . the proceedings being influenced by prejudice or bias." (internal quotation marks omitted)).   In making this determination, courts consider, "on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980).   As the moving party, Defendants must make a "concrete showing that the misconduct of counsel consistently permeated the entire trial from beginning to end." *Sutkiewicz v. Monroe Cnty. Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997).

Defendants argue that "the jury may well have been improperly biased against Defendants in relation to the infringement counts and, thus, motivated to issue an exorbitant monetary award including sizeable punitive damages."   [DE 170-1 at 3210].   The Court notes that this argument itself—that the jury **may** have been biased—does not rise to the level of "a reasonable probability that the verdict" was actually influenced by Plaintiffs' arguments.   *City of Cleveland*, 624 F.2d at 756.   So if the jury was biased by Plaintiffs' arguments, Defendants do not explicitly allege so. Nor do Defendants explain how exactly Plaintiffs' "suggestion of continuing infringement" influenced the jury's verdict[8] or why an "admonition from the Court" should have been given. [DE 170-1 at 3210-11].

---

[8] Defendants argue that the jury "may well have been . . . motivated to issue an exorbitant monetary award including sizeable punitive damages" by Plaintiffs' "suggestion of continuing infringement."   [DE 170-1 at 3210].

Although Defendants refer to "multiple occasions" and "various points during trial," they pincite only two trial transcripts, so the Court will analyze only those instances. *See* Fed. R. Civ. P. 50(a)(2), (b) ("The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment"); *see also Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008) (discussing on appeal from summary judgment, "[i]t is not the district court's (or our) duty to search through the record to develop a party's claims; the litigant must direct the court to evidence in support of its arguments." (citations omitted)).   One of Defendants' citations is to their objection on day three of trial, when Plaintiffs' attorney asked John Newton if, after the Agreement "as part of the program, [Defendants] continued to put the NPA logo--." [DE 155 at 1979-96].  Following the objection, Plaintiffs' counsel asked again about liquidation and what that meant for Defendants, and the Court sustained Defendants' objection. [*Id.* at 1996].  Defendants' other citation is to day eight, during Plaintiffs' closing argument, when Plaintiff's counsel discussed liquidation in relation to damages:

> I do believe that -- quickly, that their -- the jury should consider punitive damages for the brazenness of this. Malice is one of the elements where there's a reckless disregard for NPA and Dr. House's rights. And what happened here, you heard testimony that they -- at some point Joseph was told that he could, quote, "liquidate the balls." Well, this wasn't a -- like a furniture liquidation where you sell the balls and Players' Dugout gets the revenues.
> MR. WHEAT: Objection.
> MR. VALENTI: He actually --
> THE COURT: I'm sorry? You're objecting to the liquidation of balls?
> MR. WHEAT: He's acting like we weren't allowed to do that.
> MR. VALENTI: I thought we --
> THE COURT: Rephrase. Rephrase.
> MR. VALENTI: Well, you can decide whether -- whether taking balls using the NPA logo as a -- look – it's Exhibit 79 -- with his new Throw Smart program is a liquidation of balls by Players' Dugout Inc. It's continuing to use the mark. And, further, he testified that the company was closed -- Joseph Newton -- closed in -- when he formed Throw Smart in 2018, but Mr. Schopp said he was still continuing to do business with Players' Dugout.

[DE 166 at 3114].

On day three, Defendants' counsel interrupted Plaintiffs' counsel's "suggestion of continuing infringement" with an objection. [DE 155 at 1979; DE 170-1 at 3210]. This objection went to a prior objection made by Defendants' counsel the day before asserting that Plaintiffs' counsel's "trying to create the suggestion that the court ordered the removal of" Plaintiffs' trademark from items in Defendants' inventory. [DE 153 at 1775]. The Court ruled during the bench conference that Defendants' counsel could clear any confusion on cross-examination or rebuttal. [DE 155 at 1985-86]. Defendants' counsel asked only one unrelated question on cross and did not call that witness on rebuttal. [DE 155 at 2038-39]. This lack of questioning leads to the logical conclusion that Defendants either decided there was no confusion that the parties' agreement could have been interpreted as Plaintiffs suggested or simply chose not to clear it up any perceived confusion at that time. They cannot abruptly decide to do so now, on renewal of judgment as a matter of law. *See United States v. Isaiah*, 434 F.3d 513, 523 (6th Cir. 2006) (discussing intent to mislead the jury and finding district court made no clear error when it "permitted defense counsel to ask follow up questions to resolve any confusion"). Additionally, when Plaintiffs' counsel resumed questioning, he asked about the Agreement and Defendants' understanding of the liquidation, which Defendants' counsel objected to, and the Court sustained. [DE 155 at 1996]. The Court's opening instructions to the jury included the following admonition:

> Certain things are not evidence and must not be considered by you. I will list them for you now.
> 1. Statements, arguments, and questions by lawyers are not evidence.
> 2. Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other . . .

The Court reiterated some of this in the jury instructions, both orally and written:

> The lawyers' statements and arguments are not evidence, their questions and objections are not evidence, my legal rulings are not evidence, and my comments and questions are not evidence. Make your decision only on the evidence as I have defined it here and nothing else.

[DE 141 at 1437; 166 at 3011]. Thus, the Court had instructed the jury not to consider any sustained objection, and that arguments made by counsel—which included Plaintiffs' counsel's closing argument—were not evidence. Courts presume that jurors "follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *see also United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (a "trial court can generally correct [improper closing statements] by instructing the jury that closing arguments are not evidence") (citing *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)).

Even accepting Defendants' characterization of counsel's conduct as 'suggesting ongoing infringement,' under a totality of the circumstances, this conduct fails to rise to the level required for the remedy of a new trial. *City of Cleveland*, 624 F.2d at 756; *Hillside Prods., Inc. v. Cnty. of Macomb*, No. 06-11566, 2008 WL 4058512, at *22 (E.D. Mich. Aug. 28, 2008), *aff'd,* 389 F. App'x 449 (6th Cir. 2010) (denying motion for new trial where "court instructed the jury to not consider the arguments of counsel as evidence"). Therefore, Defendants' Renewed Motion for Judgment as a Matter of Law or New Trial [DE 170] on this claim is **DENIED**.

### d. Ratification Instruction [DE 170-1 at 3211-16].

Defendants move for a new trial "for denial of their request for a ratification jury instruction" on Defendants' defamation counterclaim. [DE 170-1 at 3211, 3216]. They argue their proposed ratification instruction "was based a [sic] correct statement of law" and that "[t]he Court's refusal to give a ratification instruction impaired Defendants' theory of the case causing unjust prejudice." [*Id.* at 3216]. Plaintiffs argue that Defendants' cited cases are inapplicable and the facts do not support a ratification instruction. [DE 179 at 3503-06].

"A district court's refusal to give a jury instruction constitutes reversible error if: "(1) the omitted instructions are a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000) (citation omitted).  "A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72–73 (6th Cir.1990).

Defendants argue the Court should have given a ratification instruction because they "submitted more than sufficient evidence to warrant an instruction that Dr. House ratified the conduct of his NPA associates, Alex Marney and Gary Adornato, in making the false and misleading statements about" Defendants.  [DE 170-1 at 3212].  The cases cited by Defendants support, as Defendants argue, that an employer may expressly or impliedly ratify the behavior of his employees.  [*Id.* at 3211-16]; *see Griffey v. Adams*, No. 5:16-CV-00143-TBR, 2018 WL 3118186, at *3 (W.D. Ky. June 25, 2018) ("Ratification is, in effect, the after the fact approval of conduct, much as authorization is the before the fact approval of the conduct" (citing *Univ. Med. Ctr., Inc. v. Beglin*, 375 S.W.3d 783, 793 (Ky. 2011), *as modified on denial of reh'g* (Mar. 22, 2012))); *Kindred Nursing Centers Ltd. P'ship v. Brown*, 411 S.W.3d 242, 249 (Ky. Ct. App. 2011) (ratification may sound "in contract or tort"); *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 875 (Ky. 2016) ("An employer's ratification of an employee's offensive conduct requires two elements: 1) an after-the-fact awareness of the conduct; and 2) an intent to ratify it.").

However, the case law cited by Defendants does not support their theory that House may ratify his NPA associates' "false or misleading statements." [DE 170-1 at 3212].  This cannot be a ratification sounding in contract because, while the lawsuit involved a contract, there is no

contract involved in House's alleged ratification; that is, Defendants are not arguing House expressly or implied ratified a contract. And Defendants never argued that House intended to ratify it—they argued that "he did nothing to stop [anyone] from sending" the email. [*Id.* at 3213]. Nor have Defendants properly supported their argument as sounding in tort, as their citations do not discuss ratification in the specific context of defamation, the subject of their counterclaim. Rather, the tort specific cases cited by Defendants explicitly discusses the ratification of *conduct*— not words.

Defendants cite one case—in reply—that discusses ratification in the context of defamation: *Pennsylvania Iron Works Co. v. Henry Voght Mach. Co.*, 139 Ky. 497 (1906). This case, though old, does discuss the ratification of libel. In *Pennsylvania Iron Works Co.*, a company manager wrote a libelous *per se* letter on company letterhead, signed using the company name. The lower court allowed for a jury instruction on ratification by silence. The jury found for the plaintiff, and judgment was affirmed on appeal. *Id.* Even if the Court relies on this case for a ratification instruction Defendants have not supported this theory of the case factually or legally. For example, the alleged defamatory emails, "Adornato's October 13 [and 14th], 2015 letter to Defendants" could not have been a defamatory statement: Defendants did not show evidence of publication to third parties, only from a third party to Plaintiffs and Defendants.[9] *See Hickman v. State Farm Prop. & Cas. Ins. Co.*, No. 3:17-CV-00184-CRS, 2017 WL 5892212, at \*2 (W.D. Ky. Nov. 29, 2017) (citing *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014), *as corrected* (Apr. 7, 2015)) ("In Kentucky, defamation consists of four elements . . . [secondly] an unprivileged publication to a third party")).

---

[9] Defendants allege that "[o]n October 13, 2015, Mr. Adornato sent a communication to Joe Newton. . ."; "The next day, on October 14, Mr. Adornato sent [NPA Coach] and Dr. House an email confirming, 'As we've discussed,' he sent Joe Newton the letter with the false allegations." [DE 170-1 at 3213-14].

Defendants fail to support their argument that House ratified "Adornato and the boys'" allegedly defamatory statements, because there was insufficient evidence to suggest they were House's agents. Defendants argue that they "requested a ratification instruction based on Dr. House's conduct related to Defendants' defamation counterclaim." [DE 170-1 at 3211]. To support their theory of agency, Defendants cite a question asked of House on the stand:

> Q. So spring of 2015 you hired these guys to make your business more efficient. They tell you, yeah, your Players' Dugout contract's not good. They tell you -- they advise you that there should be an attorney hired in Kentucky to see what could be done about the contract, correct? All of this is the spring of 2015?
> A. I have no -- yes, correct.
> Q. You have no idea what?
> A. I have no problem with that. Yes, that's correct.

[*Id.* at 3213].  This answer, in response to a compound question, does not sufficiently support that "Adornato and the boys" were House's agents, nor do Defendants cite case law suggesting such.[10]

For House to be liable for the actions of his agents, Defendants would have needed to establish either actual or apparent authority on House's individual behalf.  "Actual authority is created when a principal expressly grants the agent authority to act on its behalf."  *Muncy v. Intercloud Sys., Inc.*, No. CV 14-111-DLB-REW, 2016 WL 6471452, at *3 (E.D. Ky. Nov. 1, 2016) (citing *Kindred Nursing Centers Ltd. Partnership*, 411 S.W.3d at 249).  An apparent agent "is one whom the principal, either intentionally or by want of ordinary care, induces third persons to believe to be his agent, although he has not, either expressly or by implication, conferred authority upon

---

[10] Defendants also cite House's testimony at trial about an email Adornato sent:

> Q: (Reading) He hopes that we fully, quote, understand the seriousness with which I -- meaning him -- take the protection of NPA as an entity and Tom House as an individual. Correct?
> A. That's what it says, yes.
> Q. Do you agree this letter was on behalf of you individually also?
> A. From his perspective. He wrote it up to be involved, but, again, that was his letter, not mine. . . .
> Q. Do you disagree with this statement; that it was – that he was protecting you as an individual?
> A. (Reading) The seriousness which I take protection of the NPA as an entity and Tom House as an individual. I take that to say he was worried about me too.
> Q. And you were okay with that?
> A. Well, I would hope someone would worry about me. Yes, sir.  . . .
> A. Okay. That's fine. Did I ever see a letter from -- letter from them telling me what they did?
> Q. Did you tell them at that point, "Wait a minute. That's not what I want to do"?
> A. I didn't tell them anything.
> Q. That's my point. You didn't --
> A. I didn't tell them anything. I'm not arguing that --

[DE 159 at 2393, 2422].  These statements do not directly support agency either.  Defendants also argue that House "was agreeable to the idea that Mr. Adornato was protecting him" and "did nothing to stop [anyone] from sending" this email.  [DE 170-1 at 3213].  Again, however, Defendants cite nothing suggesting that this supports that Plaintiffs may ratify another's allegedly defamatory statements, particularly preemptively.  [DE 170-1].  *See Indus. Equip. Co. v. Emerson Elec. Co.*, 554 F.2d 276, 289 (6th Cir. 1977) (citing *Edwards v. Kentucky Utilities Co.*, 289 Ky. 375, 379 (1942) ("The fact that [defendant] did not prevent [a third-party] from mailing the letter did not constitute ratification on its part.")

him." *Id.* (citing *Middleton v. Frances*, 77 S.W.2d 425, 426 (Ky. 1934)).   No agency theory on House's individual behalf was established here.

The omission of the jury instruction also did not impair the Defendants theory of the case because the omitted instruction did not support their theory.   As discussed above, there was no conduct here to ratify, only allegedly defamatory third-party statements.   It could not support their theory because there was no theory that the statements were published.   And their theory cannot be supported by the instruction because they did not argue a theory consistent with intent to ratify. Finally, the omission of the jury instruction did not impair Defendants' theory of the case because the allegedly defamatory statements were not necessarily written by Plaintiffs' agents.   Thus, a ratification by silence instruction would not have supported Defendants' theory that Plaintiffs ratified the defamatory statements of their agents.

Thus, the omitted instruction was not "a correct statement of the law" and did not "impair[] the requesting party's theory of the case," and the Court cannot conclude that the verdict reached by the jury was a "'seriously erroneous result."   *Holmes*, 78 F.3d at 1045–46; *Hisrich*, 226 F.3d at 449.   Defendants' Renewed Motion for Judgment as a Matter of Law or New Trial [DE 170] on their defamation counterclaim is therefore **DENIED.**

e.   Defamation Per Se Weight of the Evidence [DE 170-1 at 3216-17].

Defendants, in a single paragraph, move for a new trial "[b]ecause the jury's verdict related to Defendants' defamation per se claim was clearly against the weight of the evidence."   [DE 170-1 at 3217].   At trial, the jury found for Defendants on their claim for defamation *per quod* and against them on their claim of defamation *per se*.   [DE 164 at 2958].   Defendants argue that "[d]espite the court's [earlier] finding" that Defendants established a prima facie case of both types of defamation and that the remaining issue was the truthfulness of the statements, the jury found

for Plaintiffs.  [DE 78 at 905-09; DE 170-1 at 3217].  Defendants do not expand on this argument.

Defendants also argue "against the overwhelming weight of the evidence, the jury inexplicably

found in favor of Plaintiffs" on the claim of defamation *per se*."  [DE 170-1 at 3216-17].

Defendants cite no specific evidence that contributes to the overwhelming weight in their original

brief.[11]  Plaintiffs argue the jury's verdict was reasonably reached based on the evidence and jury

instructions presented to the jury.  [DE 179 at 3506-07].

Both defamation claims (and thus the instructions) were based on the October 26, 2015

email.  The jury instruction on defamation *per quod* contained the following elements:

> (1) That NPA made a statement that was published to third parties that was
> reasonably understood by third parties to mean that players were being injured by
> Players' Dugout and the Newtons as a result of Players' Dugout and the Newtons
> not using all of the protocols of the PAJTT program,
> (2) That the statement was false,
> (3) That such statement was published with fault amounting to negligence or actual
> **malice**,
> (4) That such statement resulted in injury to reputation, and
> (5) **That Player's Dugout suffered actual economic loss directly and
> proximately caused by publication of the statement.**

[DE 141 at 1473 (emphasis added)].  The jury instruction on defamation *per se* contained the

following elements:

> (1) That NPA made a statement that was published to third parties that was
> reasonably understood by third parties to mean that players were being injured by
> Players' Dugout and the Newtons as a result of Players' Dugout and the Newtons
> not using all of the protocols of the PAJTT program,
> (2) That the statement was false,
> (3) That such statement was published recklessly or negligently,

---

[11] The Court notes again that it is not the Court's "duty to search through the record to develop a party's
claims."  *Magnum Towing & Recovery*, 287 F. App'x at 449.  Rather, "the litigant must direct the court to
evidence in support of its arguments."  *Id.* Additionally, those arguments raised for the first time in reply
are waived.  *See Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003); *Wright v. Holbrook*,
794 F.2d 1152, 1157 (6th Cir. 1986) ("Since defendant was deprived of an opportunity to address the issue
by plaintiff's failure to raise this issue in his original brief, we will consider the issue waived."); *and United
States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001) ("We generally will not hear issues raised for the first
time in a reply brief.").

(4) That such statement resulted in injury to reputation; **The injury per se results to a person when the defamatory language subjects the person to hatred, ridicule, contempt, or disgrace, or tends to induce an evil opinion in the mind of right thinking people. It also includes statements that a person is not fit to perform duties associated with his profession. The injury per se against a corporation results when the words contain an imputation of fraud, deceit, dishonesty, or other reprehensible conduct on the part of corporation.**

[*Id.* at 1467 (emphasis added)]. The difference, as emphasized, is primarily the addition of malice and the special damages elements to the *per quod* instruction and the "hatred, ridicule, contempt, or disgrace" element on the defamation *per se* instruction. Simply put, "[d]efamation *per se* occurs when material is defamatory on its face; defamation *per quod* occurs when material is defamatory through interpretation or innuendo." *Croce v. New York Times Co.*, 345 F. Supp. 3d 961, 974 (S.D. Ohio 2018), *aff'd,* 930 F.3d 787 (6th Cir. 2019).

The jury could interpret the October 26, 2015 email to be defamatory through interpretation but not on its face. Thus, the jury could reasonably find as they did on defamation *per se* and *per quod*, and the verdict was not against the weight of the evidence.

The evidence presented was a sufficient basis for the jury's verdict on defamation and the verdict is one that was reasonably reached. *Denhof*, 494 F.3d at 543. The Court cannot say that the verdict reached by the jury was a "'seriously erroneous result' as evidenced by[] the verdict being against the weight of the evidence." *Holmes*, 78 F.3d at 1045–46. Thus, Defendants' Renewed Motion for Judgment as a Matter of Law or New Trial [DE 170] on this claim is **DENIED**.

  f. <u>Constitutionality of Punitive Damages Award [DE 170-1 at 3217-20].</u>

Defendants request that the Court vacate the punitive damages award or order a new trial. [DE 170-1 at 3220]. Defendants argue that the ratio between the compensatory and punitive award was disproportionate because the jury awarded "$67,649.82 in punitive damages" and "$1 in

compensatory damages on the claim of unfair competition under Kentucky common law" on Plaintiffs' unfair competition claim.  [*Id.*].  They also argue that there were no actual damages to support the award of punitive damages.  [*Id.* at 3217-20].  Plaintiffs argue all their compensatory damages should be aggregated, and even if they are not, nominal compensatory damages can support the punitive award.  [DE 179 at 3510].

"Under Kentucky law, an award of compensatory damages is not a prerequisite to an award of punitive damages."  *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 658 (E.D. Ky. 2009).  "As the highest court in Kentucky stated long ago, 'if the plaintiff has suffered an injury for which compensatory damages might be awarded, although nominal in amount, he may in a proper case recover punitive damages.'"  *Id.* (citing *Louisville & N.R. Co. v. Ritchel*, 148 Ky. 701 (1912)).  The Kentucky Supreme Court has reiterated this rule in recent years, after the passage of KRS 411.  *See Commonwealth Dep't of Agric. v. Vinson*, 30 S.W.3d 162, 166 (Ky. 2000) ("Where the plaintiff has suffered an injury for which compensatory damages, though nominal in amount may be awarded, the jury may in a proper case, award punitive damages as well."); *see also Roberie v. VonBokern*, No. 2004-SC-000250-DG, 2006 WL 2454647, at *6 (Ky. Aug. 24, 2006), *as modified* (Dec. 21, 2006) (referencing *Ritchel* and *Vinson* in rejecting an argument that the jury's failure to award compensatory damages barred an award of punitive damages and stating, "[t]he only requirement for punitive damages in this regard is that the injury be the sort for which compensatory damages, even if only nominal, are available.").  Even the absence of a showing of actual damages does not necessarily bar an award of punitive damages.  *Vinson*, 30 S.W.3d at 166 ("'[T]he fact that the jury returned a verdict for punitive damages only furnishes no just reason why the verdict should not be allowed to stand, since, under the rule in force in this state, punitive damages, when allowed, are given as compensation to the plaintiff, and not solely as punishment

26

of the defendant.'" (quoting *Ritchel*, 148 S.W. at 701)).  Thus an award of punitive damages was not constitutionally excessive under Kentucky law, as the jury awarded compensatory damages.

Punitive damages awards are also limited under the Due Process Clause.  The key question is whether the award is grossly excessive or arbitrary.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.").  When considering the constitutionality of a punitive damages award, the Court is guided by:

> "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*Id.* at 418.  While the Supreme Court has declined "to impose a bright-line ratio which a punitive damages award cannot exceed," it has also stated, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425.  The types of cases that permissibly exceed a single digit ratio are those where a "particularly egregious act has resulted in only a small amount of economic damages" or where the "injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996).

Plaintiffs do not argue that this is the type of case in which punitive damages may permissibly exceed a single digit ratio as discussed above.  Rather, the issue here is the disparity between the actual or potential harm and the punitive damages award: the ratio of compensatory award to punitive award.[12]  [DE 170-1 at 3217-3220].  The question for the Court is the calculation

---

[12] To the extent that Defendants argue that there "is no evidence that Defendants acted with oppression, fraud, or malice," the jury found just the opposite by awarding punitive damages.  [DE 143 at 1572-73; DE 170-1 at 3220].

of the ratio—should the Court calculate a ratio on a claim-by-claim basis or should it aggregate the compensatory awards with related causes of action and compare those damages to the aggregate punitive damages.

Plaintiffs' federal and state law trademark and unfair competition were related causes of action, deriving from the common nucleus of operative fact of Defendant's unlicensed use of Plaintiffs' trademarks. *See Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 661 (E.D. Ky. 2009) (discussing Supreme Court cases that "suggest that a court can aggregate compensatory damages from multiple related causes of action when comparing compensatory damages to punitive damages."). *See Fastenal Co.*, 609 F. Supp. 2d at 660 (aggregating cases) ("The Court has only found a few circuit cases analyzing the constitutionality of punitive damage awards on individual claims, and their results differ."). *See also State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 424 (indicating that the ratio is "between harm, or potential harm, to the plaintiff and the punitive damages award"); *BMW of North America, Inc.*, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award."); *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993) ("It is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred.") *and Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657, 668 (6th Cir. 2005) (upholding lower court's combining compensatory damages from separate claims when calculating ratio even though the punitive damage award was only for one claim).

However, the Lanham Act bars the recovery of punitive damages on such claims, so the Court considers the appropriateness of aggregating these compensatory damages. *See Taco*

28

*Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991), *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) (Lanham Act "damages may be based on a finding of willful infringement, but cannot be punitive."). The federal and state law unfair competition claims were practically identical; they had no factual divergence, the jury instructions differed because of their basis in federal or state law. Had the jury awarded compensatory damages on both claims, it likely would have led to double recovery. *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 476 (6th Cir. 2022), *reh'g denied,* No. 20-3598, 2022 WL 3237492 (6th Cir. Aug. 10, 2022) ("the plaintiff must tie separate damages to a distinct harm and cannot seek a double recovery.").

The jury's award of $340,000 compensatory on the federal claim and $1 compensatory on the state law claim signals the jury's awareness of the relatedness of the federal and state law unfair competition claims and their intent to award Plaintiffs compensatory and punitive damages for trademark infringement. *People v. Rand*, 397 Mich. 638, 643 (1976) ("The written form of the verdict should not be exalted over the substantive intent of the jury."); *see also* [DE 143 at 1541-60 (jury instructions, with federal claim instructions appearing before state law claim instructions, and requiring jury to award compensatory damages on the state law claim before awarding punitive damages)]; *and Thompson v. Citizens Nat'l Bank*, No. 1:14-CV-1197, 2016 WL 7238835, at *8 (N.D. Ohio Dec. 15, 2016) (where the jury awarded contract-based compensatory damages, "the jury's failure to award compensatory damages for the tort claims was meant to avoid double recovery and does not preclude punitive damages"). Because the jury awarded compensatory damages under both federal and state law, and punitive damages are available under state law, vacating the punitive damages would lead to an illogical result which would subvert the clear intent of the jury. "The Court will not subvert the jury's intent to punish Defendants for their behavior

because the jury avoided awarding duplicate compensatory damages." *Thompson*, 2016 WL 7238835, at *8. The Court thus aggregates Plaintiffs' trademark claim compensatory damages for the ratio calculation.

Plaintiffs aggregated trademark compensatory damages amount to $340,002, and punitive damages are $67,649.82. [DE 143; DE 164; DE 179 at 3508]. As such, the aggregated punitive to compensatory damages ratio approximately 6.8:34. The aggregated ratio is constitutionally acceptable, as it does not exceed a single-digit ratio of punitive to compensatory damages.[13] *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425 ("few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

Thus, the jury's award of punitive damages violates neither Kentucky law nor the Due Process Clause. As the punitive damages are not constitutionally excessive, the Court cannot say that the verdict reached by the jury was a "'seriously erroneous result." *Holmes*, 78 F.3d at 1045–46. Thus, Defendants' Renewed Motion for Judgment as a Matter of Law or New Trial [DE 170] on the issue of punitive damages is **DENIED**.

**J. The Parties' Motions for Attorney Fees [DE 171; DE 172].**

Defendants move for attorney fees, asserting that they are the prevailing party on the unfair competition claim and that their claim is exceptional under the Lanham Act. [DE 171-1 at 3249-53]. They argue that their fees are reasonable based on apportionment for this claim, a lodestar calculation, and average awards. [*Id.* at 3253-58]. Plaintiffs also move for attorney fees, asserting they are the prevailing party in the action and that the case is exceptional for purposes of the Lanham Act. [DE 172-1 at 3328-35]. The parties' respective attorneys' fees are higher than the damages they were each awarded.

---

[13] The Court does not further consider the question of the aggregation of the breach of contract compensatory damages, as it is unnecessary for the Court's ruling.

## I.   Standard

"In awarding fees under [15 U.S.C.] § 1117 [("Lanham Act")] trial judges are given considerable discretion." *Hindu Incense v. Meadows*, 692 F.2d 1048, 1051–52 (6th Cir. 1982). Under the Lanham Act, courts may grant costs and "in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). In determining whether to award attorney's fees, the Court conducts a two-part inquiry: "(1) whether [the moving party] was a "prevailing party," and (2) whether this case was "exceptional."" *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (citing 15 U.S.C. § 1117(a)).

A "prevailing party" is one that has received at least some relief on the merit of a claim, resulting in a "judicially sanctioned change in the legal relationship of the parties." *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Hum. Res.*, 532 U.S. 598, 605 (2001); *see also Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 425 (6th Cir. 2012). Judgments on the merits, involuntary dismissals with prejudice, and court-ordered consent decrees usually satisfy this requirement. See *id.*; *Swank v. Banks*, 25 F. App'x 418 (6th Cir. 2002). A party need not win every claim to be considered the prevailing party. *Maker's Mark Distillery, Inc.*, 679 F.3d at 425. The degree of a party's success "does not affect eligibility for a fee award, but only goes to the reasonableness of the amount of that award." *Balsley v. LFP, Inc.*, 691 F.3d 747, 772 (6th Cir. 2012) (internal quotations omitted).

"District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 545 (2014). While "exceptional" is not defined in the Lanham Act, the Sixth Circuit has held that "a case is not exceptional unless the infringement was malicious, fraudulent, willful, or deliberate." *Audi AG*, 469 F.3d at 551. "[M]ost of the cases

involving 15 U.S.C. § 1117(a) have applied the "exceptional" case analysis to prevailing plaintiffs." *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004).

If a district court determines that the case is exceptional, the Court must also determine the reasonableness of fees. A reasonable fee must be "adequately compensatory to attract competent counsel" but avoid "producing a windfall for lawyers." *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007). In determining a reasonable fee, a district court "begins by determining 'the fee applicant's lodestar, which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his court-ascertained reasonable hourly rate.'" *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821 (6th Cir. 2013) (quoting *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000)). In determining a reasonable rate "[a] district court may rely on a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 499 (6th Cir. 2011) (citing *B & G Min., Inc. v. Dir., Off. of Workers' Comp. Programs*, 522 F.3d 657, 664 (6th Cir. 2008); *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004)). To prove that the requested fees are reasonable, the requesting party must also provide "evidence supporting the hours worked and rates claimed." *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1207 (6th Cir. 1992) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). In considering whether the time expended is reasonable, the Court should "exclude excessive, redundant, or otherwise unnecessary hours." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1193 (6th Cir. 1997) (citing *Hensley*, 461 U.S. at 434).

In a Lanham Act case, the fees must also be apportioned in relation to the Lanham Act Claims. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1193 (6th Cir. 1997)

("[U]nder 15 U.S.C. § 1117(a), attorneys' fees are recoverable only for work performed in connection with claims filed under the Lanham Act.").

## II. Analysis

### a. Plaintiffs' Attorneys' Fees

Plaintiffs are prevailing parties, as the jury found in their favor on their trademark infringement and unfair competition claims brought under the Lanham Act.  [DE 164 at 2957].

Defendants argue the case was not exceptional because their continued use was reasonable, as they relied on the advice of counsel, and because their use did not actually infringe.  [DE 177 at 3452-59].  The jury found that Defendants use infringed on Plaintiffs' trademark, and that their unfair competition was done "maliciously, wantonly or oppressively."  [DE 141 at 1471].  While this finding of 'malicious, wanton, or oppressive' infringement awarded punitive damages under Kentucky law, they are nearly identical legally, and they are factually identical, united by a common nucleus of operative facts, Defendants' unlicensed use of Plaintiffs' trademarks.  Thus, the jury finding supports that this case was "exceptional" as to Defendants' infringement.  *Audi AG*, 469 F.3d at 551 (quoting *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004) (holding that exceptional cases are ones that are "malicious, fraudulent, willful, or deliberate")); *see also Taylor v. Thomas*, No. 212CV02309JPMCGC, 2015 WL 11145042, at *3 (W.D. Tenn. Nov. 24, 2015) ("A finding of willful infringement qualifies a case as an "exceptional" one.").  And according to the citation provided by Defendants, any argument Defendants make on advice of counsel would have required putting on proof to the jury, which they did not provide.  5 McCarthy on Trademarks and Unfair Competition § 30:100 (5th ed.) ("While under certain circumstances a party's reasonable reliance on the advice of counsel 'may defuse otherwise willful conduct,' there must be proof of what counsel's advice was and that reliance on that advice was

reasonable under the circumstances.") (citing *Takecare Corp. v. Takecare of Oklahoma, Inc.*, 889 F.2d 955 (10th Cir. 1989) (an award of attorney's fees against an infringing defendant was affirmed where the attorney's opinion letter was not put into evidence).

Having determined that Plaintiffs may recover attorneys' fees, the Court next addresses the appropriate amount. Plaintiffs' lead attorney submitted a declaration with attached billing records in support of their motion. [DE 172-4]. The fees and costs submitted by Plaintiffs' total $178,571.25, which they argue is an apportioned amount, based on a total of 1,688.6 attorney hours and a total fee amount of $433,807.01. [*Id.* at 3436; DE 180 at 3528; DE 180-1]. The requested amount reflects a pre-apportioned 407.59 hours for attorney MAV, 229.35 hours for HAH, 27.30 hours for LSA, and $2,781.95 in expenses for legal services relating to their Lanham Act claims. [DE 172-4 at 3376, 3436]. The rate billed varies over the six years spent in litigation. MAV billed $295-$375 per hour, HAH billed $150-175 per hour, and LSA billed $200 per hour. [*Id.* at 3376]. While the declaration does not offer other rates or case comparators, Defendants do not argue the hourly rates or the hours expended are unreasonable. [*See* DE 177 at 3451-67]. Furthermore, this Court has such information at hand to satisfy it that the hourly rates billed are reasonable and commensurate with the rates charged by firms of comparable talent and experience in this district for work in this area of practice. *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004) ("To arrive at a reasonable hourly rate, courts use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record."); *Kritcher v. Prudential Sec., Inc.*, 799 F. App'x 376 (6th Cir. 2020) ("A reasonable fee is 'one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers.'") (quoting *Geier*, 372 F.3d at 791).

34

Defendants argue Plaintiffs' requested fees are unreasonable because they are not apportioned to include only fees related to Plaintiffs' Lanham Act claim. [DE 177 at 3459-67]. Defendants argue that some entries on the billing records submitted by Plaintiffs fail to "describe to which of their claims they pertain." [*Id.* at 3463]. Defendants suggest that the "proper method to ascertain the amount of fees that would be reasonable would be through the method implemented in" their own motion for fees. [*Id.* at 3461-62]. Defendants suggest 8.82 percent of attorneys' fees is appropriate for apportionment because:

- Thirty-two of the total seventy-three paragraphs in the Complaint, which does not include jurisdictional paragraphs or "incorporating" paragraphs, were spent discussing facts, circumstances, and claims relating to Plaintiffs' Lanham Act and related causes of action. This totals 43.83 percent of the Complaint.
- Four out of Plaintiffs' fifty requests for admission relate to Plaintiffs' Lanham Act and related claims. This equates to .08 percent of their requests for admission.
- Two out of Plaintiffs' twenty-one interrogatories on behalf of Dr. House relate to Plaintiffs' Lanham Act and related claims. This equates to .1 percent of their interrogatories on behalf of Dr. House.
- Zero out of Plaintiffs' sixteen interrogatories on behalf of the NPA relate to Plaintiffs' Lanham Act and related claims. This obviously equates to 0 percent of their interrogatories on behalf of the NPA.
- Finally, two out of Plaintiffs' twenty-two requests for production relate to Plaintiffs' Lanham Act and related claims. This equates to .09 percent of their requests for production.

[*Id.*]. Defendants argue that the average of these percentages, 8.82 percent, "relate[s] to how much of the case Plaintiffs actually devoted to their Lanham Act and related claims" and request the Court "reduce Plaintiffs' award to $15,504.62, or 8.82 percent of Plaintiffs' request." [*Id.* at 3462, 3467].

As argued by both parties, only Plaintiffs' Lanham Act claim allows for recovery, and their fees must be apportioned as to the Lanham Act and related claims. *U.S. Structures, Inc.*, 130 F.3d at 1193; *see* [DE 172; DE 177 at 3452-59]. Plaintiffs prevailed on each of their ten claims against Defendants. [DE 164]. Four of their ten claims were Lanham Act claims, and five more claims

35

were related state law trademark infringement, unfair competition, and punitive damages claims, dealing with the infringement of the same trademarks. *See* [DE 164; DE 180]. Defendants do not specifically address which claims are related, but their brief argues only that Plaintiffs' requested fees fail to allocate as to their "Lanham Act and related claims" or breach of contract claims. *See* [DE 177 at 3465]. When arguing on jury instructions, Defendants also argued that Plaintiffs' common law trademark infringement claims were the same as their federal trademark infringement claims. [DE 161 at 2545]. Plaintiffs do not argue their breach of contract claim relates to their Lanham Act claim. *See* [DE 180 at 3530]. The parties thus appear to agree that nine of Plaintiffs' ten claims are related. Defendants counterclaims added six claims, for a total of sixteen claims or instructions submitted to the jury. The proportion of Plaintiffs' nine Lanham Act and related claims out of all sixteen submitted to the jury is thus 56.3 percent. [14]

Plaintiffs argue the total amount they request is apportioned. [DE 180 at 3528-34]. While not every entry in Plaintiffs' submitted billing records identifies a claim, each entry is multiplied by a percentage spent on Lanham Act claims. [*Id.*]. Plaintiffs state that this reflects a "28.2% of the value of the total hours expended litigating the entire case." [DE 172-4; DE 180 at 3528-34]. Plaintiffs request $175,789.30 of a total submitted $433,807.01, or 40.5% of the total submitted to the Court.[15] [DE 172-4 at 3436; DE 180 at 3528; DE 180-1].

The Court reviewed Plaintiffs' billing entries, including each of those pointed out by Defendants, for example depositions for which Defendants contend "Plaintiffs claim all this time." [DE 177 at 3461-67]. Every entry in Plaintiffs' billing includes a multiplier for Lanham Act claims. [DE 172-4 at 3380-3436]. Notably, Plaintiffs achieved a high degree of success, as they succeeded on all of their claims, and the highest recovery Plaintiffs achieved was on their Lanham

---

[14] Stated numerically, this calculation is 9/19 = 56.3%.
[15] Stated numerically, this calculation is $175,789.30/$433,807.01 = 40.5%.

Act claim.  The total amount requested thus reflects an apportionment of fees to the Lanham Act claims, which is less than the 56.3 percent of Plaintiffs' Lanham Act and related claims submitted to the jury and which the Court finds is reasonable in this case, particularly in consideration of the high degree of success Plaintiffs achieved.  *See Mike Vaughn Custom Sports, Inc. v. Piku*, No. 12-13083, 2015 WL 4603171, at *5 (E.D. Mich. July 30, 2015) (using percentage of claims submitted to jury as a method of apportionment); *and Safeworks, LLC v. Teupen Am., LLC*, No. C08-12197, 2010 WL 3033711, at *3 (W.D. Wash. July 29, 2010) ("Reducing a total attorney fee amount by a percentage that represents work on non-Lanham Act claims . . . is one method courts have used to apportion attorneys' fees") (citing *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1157–58 (9th Cir. 2002).  The Court thus grants Plaintiffs entire request for fees for $175,789.30.  [DE 172-4 at 3436; DE 180 at 3533].

Defendants have not objected to Plaintiffs' expenses.  Plaintiffs provided detailed billing records specifically identifying the types of expenses and amounts.  *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 853 (E.D. Mich. 2006) (granting "reasonable" costs to Plaintiff who "as a prevailing party" in Lanham Act trademark infringement case "should be awarded its costs in this action.").  The Court thus finds costs reasonable and appropriate and grants the entire request for expenses in the amount of $2,781.95.  [DE 172 at 3436].

The Court therefore **GRANTS** Plaintiffs' Motion for Attorney Fees [DE 172] and awards attorney fees and costs totaling $178,571.25.

### b. *Defendants' Attorneys' Fees*

Defendants are prevailing parties under the Lanham Act, as the jury found in their favor on their Lanham Act unfair competition claim.[16]  [DE 164 at 2958].

Defendants argue that their unfair competition claim is exceptional under the Lanham Act. [DE 171-1 at 3250-53].  Defendants' unfair competition claim, for false advertisement, was based on NPA's October 26, 2015 email, which stated that Defendants were harming players through their failure to follow Plaintiffs' protocols.  [DE 141 at 1479].  Plaintiffs argue Defendants' claim is not exceptional, because Plaintiffs' defenses were objectively reasonable.  Plaintiffs contend that Defendants "did not believe that their litigation position regarding their false advertising claim was one of overwhelming strength" as Defendants did not move for summary judgment on the claim.  [DE 178 at 3475-77].

 Defendants argue that their case is exceptional because of the "substantive strength of [their] litigating position [and] the unreasonable manner in which the case was litigated."  [DE 171-1 at 3251; DE 182 at 3584-92].  But this standard applies to prevailing defendants, and Defendants are not prevailing defendants under the Lanham Act,[17] as the jury found for Plaintiffs on each of Plaintiffs' Lanham Act claims.  [DE 164].  *See Octane Fitness, LLC*, 572 U.S. at 546 ("A district court may award fees in the rare case in which a party's unreasonable, though not independently sanctionable, conduct is so "exceptional" as to justify an award.  For litigation to fall within [this] category, a district court must determine that the litigation is both objectively baseless and brought in subjective bad faith.").  For a plaintiff's Lanham Act claim to be

---

[16] Defendants move for fees as counterclaim Plaintiffs and not as Defendants; that is, they argue they succeeded in their own claim and do not plead that Plaintiffs brought an oppressive suit.  [*See* DE 171]; *see also Eagles, Ltd.*, 356 F.3d at 728–29 ("oppressive" or "unreasonable manner" standard applicable to prevailing defendants requires "an objective inquiry into whether the suit was unfounded when it was brought and a subjective inquiry into the plaintiff's conduct during litigation.") (citations omitted).

[17] Defendants do not argue they are prevailing defendants.

"exceptional," the infringement must be "malicious, fraudulent, willful, or deliberate." *Audi AG*, 469 F.3d at 551.

Defendants also argue that "the egregious nature of the statements, the malicious manner in which they were made, with knowledge of their falsity, their devastating impact on the Newtons personally and Players' Dugout financially, and the NPA and Dr. Houses' failure to subsequently retract them" makes the violation malicious, willful, or deliberate. [DE 171-1 at 3253]. Defendants point to House's testimony at trial "following extensive cross examination" that "[t]here is absolutely no basis for [the] statement" in the email that several customers have been hurt. [DE 159 at 2385; DE 171-1 at 3253]. While this is evidence that the statement in the email was false, it fails to establish malice, willfulness, or deliberateness. That said, the jury's finding on defamation *per quod*, based on the same email, required a finding that the "statement was published with fault amounting to negligence or actual malice." [DE 141 at 1476]. While this was based on one of Defendants' state law counterclaims, the two claims have the same factual basis: the email. [*Id.* at 1476-77, 1479-80]. The Court cannot know which the jury found, negligence or actual malice. However, the Court uses its discretion in awarding fees to find that the jury's finding just ekes by. *See Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998) ("we review a district court's decision to award attorney's fees under the Lanham Act in the same way as its decision to award attorney's fees under any discretionary provision; i.e., for an abuse of discretion."). In making this finding, the Court considers the facts and circumstances and the record as a whole, including the other claims, having sat through eight days of trial and listened to testimony, observed the conduct of the parties and counsel, and the Court's familiarity with the parties' agreements, stipulations, and discovery. Thus, the Court finds that the jury's finding on

defamation *per quod* supports that Defendants' case was "exceptional" as to Plaintiffs' unfair competition. *Audi AG*, 469 F.3d at 551.

Having determined that Defendants may recover attorneys' fees, the Court next addresses the appropriate amount. Defendants' attorney Wheat submitted a declaration with attached billing records in support of their motion. [DE 171-2]. Defendants submit attorneys' fees totaling $621,847.80, and request $260,556.84, or 41.5 percent of their total fees.[18] [DE 171-1 at 3256]. The rate billed varies, presumably due to changing rates over the course of the six years spent in litigation. Per hour, JAW billed $390-$450, BBP $280-$290, CJG $255-$265, BLR $245-$250, WGC $1-$195, JEM $175, HN $100-$104, PJR $180-$275, IGS $100, CS $100-$150, AGH $85-125, KLB, KRB, and NTM $85. [DE 171-3 at 3264]. JAW billed 524.5 hours, BBP 452.7 hours, CJG 23.6 hours, BLR 152.5 hours, KLB 17.3 hours, KRB 1.7 hours, WGC 21.4 hours, JEM 98.9 hours, NTM 9.9 hours, HN 7.7 hours, PJR 688.4 hours, IGS 5.6 hours, CS 328.7 hours, and AGH 152.7 hours. [*Id.*]. The Court finds the number of individuals billing to be unreasonable and likely contributed to duplication of work and inefficient billing. While the declaration does not offer other rates or case comparators, and the motion only otherwise discusses some nation averages, Plaintiffs do not argue the hourly rates or the hours expended are unreasonable. [*See* DE 177 at 3451-67]. As above, this Court has such information at hand to satisfy it that the hourly rates billed are reasonable and commensurate with the rates charged by firms of comparable talent and experience in this district for work in this area of practice. *Geier*, 372 F.3d at 791 ("To arrive at a reasonable hourly rate, courts use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record."); *Kritcher*, 799 F. App'x 376 ("A reasonable fee is 'one that is adequately

---

[18] Stated numerically, this calculation is $260,553.84/$621,847.80 = 41.5%.

compensatory to attract competent counsel yet which avoids producing a windfall for lawyers.'")
(quoting *Geier*, 372 F.3d at 791).

Of course, as above, Defendants' fees must be apportioned. Plaintiffs argue Defendants'
apportionment is unreasonable because their 41.5 percent is applied to the total hours worked,
rather than apportioning as to the counterclaims Defendants prevailed on. [DE 178 at 3480].
Plaintiffs argue that of the total twenty-two claims litigated, Defendants prevailed on four
counterclaims, leading to an appropriate apportionment of 18.1 percent of Defendants' requested
fee. [*Id.* at 3478-81]. Defendants argue that of their "nine total counterclaims, six of them related
to the very same common nucleus of operative facts that support Defendants' Lanham Act claim."
[DE 171-1 at 3255]. Defendants enumerate these claims: "disparagement/trade libel (Count IV),
defamation (Count V), [Lanham Act] unfair competition (Count VI), common law unfair
competition and deceptive trade practices (Count VII), tortious interference with contracts (Count
VIII), and tortious interference with prospective business advantage (Count IX)." [*Id.*].
Defendants argue these are related "because they deal with the same tortious statement from
Plaintiffs and the damages to their business flowing therefrom" and because "any written discovery
requests and deposition questions that would tend to support one of these six claims would tend to
support the other five." [*Id.*]. Of the counterclaim instructions submitted to the jury, one was a
Lanham Act claim, and only the common law unfair competition (tortious interference) and
punitives claims were inextricably intertwined because they dealt with the same facts and nearly
identical law. [DE 141 at 1473-84; DE 180 at 3530]; *see Mike Vaughn Custom Sports, Inc. v.
Piku*, No. 12-13083, 2015 WL 4603171, at *3 (E.D. Mich. July 30, 2015) (citing *Gracie v. Gracie*,
217 F.3d 1060, 1070 (9th Cir. 2000) ("The Court may award fees for non-Lanham Act claims, but
only if 'the claims are so inextricably intertwined that even an estimated adjustment would be

meaningless.'").  The remaining claims, for disparagement (which did not go to the jury) and tortious interference with contract and prospective business advantage, are not so inextricably intertwined that an estimated adjustment would be meaningless.  While the claims arise from the same fact—the email—they have bases in different law, and the Court thus finds that Defendants may not recover attorneys' fees for these claims.

The proportion of Defendants' total three Lanham Act and related claims out of all sixteen submitted to the jury is thus 18.75 percent.[19]  Defendants request $260,556.84 in attorneys' fees and costs.  [DE 171 at 3247].  As stated above, this request for $260,556.84 reflects apportionment of 41.5 percent of the total $621,847.80 fees.  [DE 171-1 at 3249-56].  The court finds it appropriate to reduce this apportionment in relation to Defendants' Lanham Act and related claims submitted to the jury, 18.75 percent, for a starting total of $116,596.46.[20]

But that does not end the analysis.  The Court also finds it appropriate to look at the degree of the parties' success to determine if the award of $116,596.46 to the Defendants' is reasonable. While success is not the measure for attorneys' fees, the amount Defendants have requested is unreasonable considering the degree of success and the awards received on the parties' primary claims.  *See Balsley*, 691 F.3d at 772 (The degree of a party's success "does not affect eligibility for a fee award, but only goes to the reasonableness of the amount of that award.") (internal quotations omitted).  *See also Timber Prod. Inspection, Inc. v. Coastal Container Corp.*, No. 1:10-CV-542, 2012 WL 13018622, at *2 (W.D. Mich. Mar. 29, 2012)  ("Considering that the central focus of this action was Plaintiff's federal law trademark infringement claim and the degree of success Plaintiff achieved on this claim").  In reaching this conclusion, the Court considers all of the factors before it, as enumerated above, as well as its review of the discovery process, trial itself,

---

[19] Stated numerically, this calculation is 3/16 = 18.75%.
[20] Stated numerically, this calculation is $621,847.80*0.1875 = $116,596.46.

conduct of counsel, including the number of litigators billing and attorneys at trial given the case complexity.

Plaintiffs received a total of $340,000 on their Lanham Act trademark infringement claim. [DE 142 at 1511]. On Defendants' claim of unfair competition, the jury awarded $25,000 and on their related claim of tortious interference the jury awarded $50,000. [*Id.* at 1517–18]. Using this degree of success, dividing the Defendants total award of $75,000 by the Plaintiffs' award of $340,000, yields a proportion of 22.06%.[21] Multiplying the starting total above, $116,596.46, by this proportion, nets a total attorneys' fee award for Defendants of $25,721.18.[22] This total amount requested thus reflects an apportionment of fees to the Lanham Act and related claims submitted to the jury and which the Court finds is reasonable, particularly considering the focus of this action was Plaintiffs' trademark infringement claims, on which they entirely succeeded. *See Mike Vaughn Custom Sports, Inc.*, 2015 WL 4603171, at *5 (using percentage of claims submitted to jury as a method of apportionment); *Safeworks, LLC*, 2010 WL 3033711, at *3 ("Reducing a total attorney fee amount by a percentage that represents work on non-Lanham Act claims . . . is one method courts have used to apportion attorneys' fees") (citing *Cairns*, 292 F.3d at 1157–58; *Timber Products Inspection, Inc.*, 2012 WL 13018622, at *2.

The Court thus **GRANTS** Defendants' Motion for Attorney Fees [DE 171] and awards fees for $25,721.18.

### III. <u>CONCLUSION</u>

For the reasons above, and being otherwise sufficiently advised, **THE COURT ORDERS AS FOLLOWS**:

---

[21] Stated numerically, this calculation is $75000/$340000 = 22.06%.
[22] Stated numerically, this calculation is $116,596.46*0.2206 = $25,721.18.

(1) Defendants' Motion for Renewed Judgment as a Matter of Law or for New Trial [DE
170] is **DENIED**;

(2) Defendants' Motion for Attorney Fees [DE 171] is **GRANTED in part**;

(3) Plaintiffs' Motion for Attorney Fees [DE 172] is **GRANTED**.

Rebecca Grady Jennings, District Judge
United States District Court

August 22, 2022

Copies to:     Counsel of record